[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 17-13139

_____

D.C. Docket No. 4:15-cv-00170-HLM

MAURICE WALKER,
on behalf of himself and others similarly situated,

Plaintiff - Appellee,

versus

CITY OF CALHOUN, GA,

Defendant - Appellant.

_____

Appeal from the United States District Court
for the Northern District of Georgia

_____

(August 22, 2018)

Before MARTIN, JULIE CARNES, and O'SCANNLAIN,[*] Circuit Judges.

O'SCANNLAIN, Circuit Judge:

We must decide what process the Constitution requires in setting bail for indigent arrestees.

## I

## A

When this lawsuit began, Maurice Walker was a 54-year-old unemployed man with a mental health disability, whose income consisted only of $530 in monthly Social Security disability payments. On Thursday, September 3, 2015, Walker was arrested in the City of Calhoun, Georgia by the Calhoun Police Department for being a pedestrian under the influence of alcohol, in violation of Ga. Code Ann. § 40-6-95. A violation of that section of Georgia's code "is a misdemeanor and is punishable upon conviction by a fine not to exceed $500.00." The statute does not provide for any possible jail sentence.

Walker alleges that, after he was taken to jail, he was told by an officer that "he would not be released unless he paid the standard $160 cash bond" required for those charged with being a pedestrian under the influence. Walker says that

---

[*] Honorable Diarmuid F. O'Scannlain, United States Circuit Judge for the Ninth Circuit, sitting by designation.

2

neither he nor his family had enough money to post the bond.  Walker alleges that while he was jailed, he was not given his necessary mental disorder medication, and he was confined to a single-person cell except for one hour each day.

Walker filed this suit five days after his arrest, while still detained, alleging on behalf of himself and a class of similarly situated indigent arrestees that the City was violating the Fourteenth Amendment of the United States Constitution by "jailing the poor because they cannot pay a small amount of money."  On the day after filing suit Walker was released on a personal-recognizance bond by agreement with the City's counsel.  A bond was subsequently tendered for Walker by one of his attorneys in this matter, and his criminal case was closed on October 20, 2015, by entry of a bond forfeiture.

B

Walker alleges that, at the time of his arrest, the City followed a policy of using a secured-money bail schedule with bond amounts based on the fine an arrestee could expect to pay if found guilty, plus applicable fees.  Defendants who could afford to deposit the bail amount were released immediately, whereas those who could not pay were held until the next court session on the following non-holiday Monday.  In Walker's case, because the Monday after his arrest was Labor

3

Day, he would have had to wait eleven days after his arrest to see a judge for a bail hearing.

Shortly after Walker's suit was filed, the Municipal Court of the City of Calhoun altered the prevailing bail policy by issuing a Standing Bail Order, which adopted a bail schedule for State offenses within the Municipal Court's jurisdiction, with cash bail set at "amount[s] represent[ing] the expected fine with applicable surcharges . . . should the accused later enter a plea, or be found guilty." As alternatives to cash bail, the Standing Bail Order recognized an arrestee's ability to use a driver's license as collateral or to "make secured bail by property or surety" at an amount "twice that set forth in [the] schedule."

"For those individuals who do not obtain release pursuant to the secured bail schedule," the Standing Bail Order provides that they "shall . . . be brought before the [Municipal] Court" within 48 hours from their arrest, shall "be represented by court appointed counsel," and "will be given the opportunity to object to the bail amount . . . , including any claim of indigency." The Municipal Court will then "determine whether the accused is unable to post secured bail because he/she is indigent, making an individualized determination based upon the evidence provided." The Standing Bail Order adopts a standard of indigency as "earning less than 100 percent of the federal poverty guidelines, unless there is evidence that

4

the person has other resources that might be reasonably used." If the court finds that the defendant is indigent under that standard, "then he/she shall be subject to release on recognizance without making a secured bail." If no hearing is held within 48 hours, "then the accused shall be released on a recognizance bond." Finally, the Standing Bail Order provides that those charged with a violation of the City Code (as opposed to State law) "shall be released on an unsecured bond in the amount established by the . . . bail schedule."

In summary, the Standing Bail Order envisions three forms of release depending on the type of offense charged and the financial means of the arrestee. *First*, arrestees charged with State offenses within the Municipal Court's jurisdiction will be released immediately on a secured bond if they are able and willing to deposit money bail in the amount set by the bail schedule. They can post cash bail themselves or use a commercial surety at twice the amount set by the bail schedule. *Second*, arrestees charged with State offenses who do not post bail immediately must wait for a bail hearing with court-appointed counsel, to take place within 48 hours from arrest. Those who can prove they are indigent at the hearing will be released on a recognizance bond—meaning no bail amount is set, either secured or unsecured. *Third*, all arrestees charged with violating City ordinances will be released on unsecured bond, meaning that they need deposit no

5

collateral immediately but will be assessed the bail schedule amount if they fail subsequently to appear in court.

## C

### 1

Several months after Walker filed suit, and after the Standing Bail Order had gone into effect, the district court entered a preliminary injunction ordering the City "to implement post-arrest procedures that comply with the Constitution." *Walker v. City of Calhoun, Ga.* (*Walker I*), No. 4:15-CV-0170-HLM, 2016 WL 361612, at *14 (N.D. Ga. Jan. 28, 2016). As the legal basis for the injunction, the district court found that "[a]ny bail or bond scheme that mandates payment of pre-fixed amounts for different offenses to obtain pretrial release, without any consideration of indigence or other factors, violates the Equal Protection Clause." *Id.* at *10. On the same day it issued the injunction order, the district court certified a class under Federal Rule of Civil Procedure 23, consisting of "[a]ll arrestees unable to pay for their release who are or will be in the custody of the City of Calhoun as a result of an arrest involving a misdemeanor, traffic offense, or ordinance violation."

6

2

We vacated such preliminary injunction, holding that it violated Federal Rule of Civil Procedure 65 because it was insufficiently specific. *See Walker v. City of Calhoun, Ga.* (*Walker II*), 682 F. App'x 721, 724–25 (11th Cir. 2017) (per curiam) (unpublished). We declined at that time to consider "whether, substantively, [the] district court properly issued a preliminary injunction." *Id.* at 724.

3

On remand, the district court again found the City's bail policy under the Standing Bail Order to be unconstitutional and entered a new preliminary injunction. It reaffirmed its merits rulings from the original preliminary injunction order and found that the Standing Bail Order "still violates the Constitution insofar as it permits individuals who have sufficient resources to post a bond . . . to be released immediately, while individuals who do not have those resources must wait forty-eight hours for a hearing." *Walker v. City of Calhoun, Ga.* (*Walker III*), No. 4:15-CV-0170-HLM, 2017 WL 2794064, at *2–3 (N.D. Ga. June 16, 2017). The court enjoined the City "from detaining indigent . . . arrestees who are otherwise eligible for release but are unable, because of their poverty, to pay a secured or money bail." *Id.* at *4.

7

The order granting the new injunction prescribed an affidavit-based process for making such determination:

> If an arrestee indicates that he or she is unable to pay a secured or money bail, arresting officers, jail personnel, or Municipal Court staff must, as soon as practicable after booking verify the arrestee's inability to pay a secured or money bail by means of an affidavit sworn before an authorized official.

*Id.* Such affidavit must include information about the arrestee's finances and the opportunity for the arrestee to attest indigency, which the injunction order defines as "less than 100 percent of the applicable federal poverty guidelines." *Id.* An official must evaluate the affidavit "within twenty-four hours after arrest." *Id.* at *5. Those found indigent "shall be subject to release on . . . recognizance without making secured bail . . . or subject to release on an unsecured bond." *Id.*

4

The City timely appealed the new preliminary injunction order,[1] as well as the district court's orders certifying the class and denying the City's motion to dismiss. The district court stayed further proceedings pending resolution of this appeal, but the injunction "remains in full force and effect."

---

[1] We have jurisdiction to review an interlocutory order granting a preliminary injunction under 28 U.S.C. § 1292(a)(1).

8

II

Before reaching the merits of the constitutional issues underlying the preliminary injunction, we must address two threshold challenges that the City raises to the district court's ability to enjoin the City at all.

A

First, the City argues that the district court should have declined to exercise jurisdiction altogether under the abstention doctrine of *Younger v. Harris*, 401 U.S. 37, 44 (1971), which "restrain[s] courts of equity from interfering with criminal prosecutions." *Younger* is "based not on jurisdiction, but on the principles of equity and comity," and it commands that "'absent extraordinary circumstances federal courts should not enjoin pending state criminal prosecutions.'" *Hughes v. Att'y Gen. of Fla.*, 377 F.3d 1258, 1262–63 (11th Cir. 2004) (quoting *New Orleans Pub. Serv., Inc. v. Council of City of New Orleans*, 491 U.S. 350, 364 (1989)). Abstention, however, has become disfavored in recent Supreme Court decisions. *See, e.g.*, *Sprint Commc'ns, Inc. v. Jacobs*, 571 U.S. 69, 77–78 (2013) ("Jurisdiction existing, this Court has cautioned, a federal court's obligation to hear and decide a case is virtually unflagging," and "only exceptional circumstances . . . justify a federal court's refusal to decide a case in deference to the States." (internal quotation marks and alterations omitted)).

9

*Younger* does not readily apply here because Walker is not asking to enjoin any prosecution. Rather, he merely seeks prompt bail determinations for himself and his fellow class members. *Gerstein v. Pugh*, 420 U.S. 103 (1975), is instructive. There, Florida detainees sought injunctive relief to receive prompt probable cause determinations, and the State argued that *Younger* should have barred the district court from considering the claim. The Supreme Court disagreed, holding that *Younger* abstention did not apply because "[t]he injunction was not directed at the state prosecutions as such, but only at the legality of pretrial detention without a judicial hearing, an issue that could not be raised in defense of the criminal prosecution." *Gerstein*, 420 U.S. at 108 n.9. So too here.

The City seeks to avoid the import of *Gerstein* by pointing to case law indicating that in some circumstances *Younger* abstention will apply even if the district court is not being asked to enjoin a prosecution, where injunctive relief would entail intrusive federal court interference with State prosecutions generally. In *O'Shea v. Littleton*, for instance, the plaintiffs alleged that a county judge engaged in a host of unconstitutional practices in setting bonds, imposing discriminatory sentences, and setting fees for jury trials. 414 U.S. 488, 491–92 (1974). As the Supreme Court characterized it, the plaintiffs sought "an injunction aimed at controlling or preventing the occurrence of specific events that might take

10

place in the course of future state criminal trials," which amounted to "an ongoing federal audit of state criminal proceedings." *Id.* at 500. The Court ruled that such an injunction would be inappropriate under the *Younger* doctrine because federal courts "should not intervene to establish the basis for future intervention that would be so intrusive and unworkable." *Id; see also Luckey v. Miller*, 976 F.2d 673, 677 (11th Cir. 1992) (applying *Younger* abstention to a suit broadly challenging the adequacy of Georgia's indigent criminal defense system because, "[a]lthough it is true that Plaintiffs do not seek to . . . restrain any individual prosecution, it is nonetheless clear that [Plaintiffs] intend to restrain every indigent prosecution and contest every indigent conviction until the systemic improvements they seek are in place.").

But Walker does not ask for the sort of pervasive federal court supervision of State criminal proceedings that was at issue in *O'Shea*. Instead, as in *Gerstein*, Walker merely asks for a prompt pretrial determination of a distinct issue, which will not interfere with subsequent prosecution. At the very least, the district court could reasonably find that the relief Walker seeks is not sufficiently intrusive to implicate *Younger*. Because we review a *Younger* abstention decision for abuse of discretion, *see Hughes*, 377 F.3d at 1262, we are satisfied that the district court was not required to abstain.

11

B

Next, the City argues that it is not responsible for its bail policy and hence cannot be liable for any constitutional violations related to bail under 42 U.S.C. § 1983. The City claims that bail policy is attributable only to the Municipal Court, which it says is independent of the City. The district court disagreed, finding that the Municipal Court acted on behalf of the City and that the City could itself set bail policy directly through its control of its police. *See Walker I*, 2016 WL 361612, at *13; *Walker III*, 2017 WL 2794064, at *2 (re-adopting reasoning of *Walker I*).

A municipality is liable under § 1983 where an "'official policy' causes a constitutional violation." *Grech v. Clayton County, Ga.*, 335 F.3d 1326, 1329 (11th Cir. 2003) (quoting *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 694 (1978)). "A plaintiff . . . has two methods by which to establish a [municipality's] policy: identify either (1) an officially promulgated [] policy or (2) an unofficial custom or practice . . . shown through the repeated acts of a final policymaker for the [municipality]." *Id.* at 1329. Liability may be established "by acquiescence in a longstanding practice or custom which constitutes the 'standard operating procedure' of the local governmental entity." *Jett v. Dallas Indep. Sch. Dist.*, 491 U.S. 701, 737 (1989). Because we review the grant of a preliminary injunction for

12

abuse of discretion, *Palmer v. Braun*, 287 F.3d 1325, 1329 (11th Cir. 2002), we can upend the injunction for lack of § 1983 liability only if the district court applied an "incorrect legal standard" or its "factual findings are clearly erroneous." *Wreal, LLC v. Amazon.com, Inc.*, 840 F.3d 1244, 1247 (11th Cir. 2016).

Here, Georgia law indicates that the City has the authority to set bail policy. In Georgia, a municipality's authority flows from "the state, manifested in the constitution, state laws, and the municipal charter." *Porter v. City of Atlanta*, 384 S.E.2d 631, 632 (Ga. 1989). By statute, Georgia "grants a city the legislative power to adopt ordinances 'relating to its property, affairs, and local government for which no provision has been made by general law and which are not inconsistent with the [Georgia] Constitution.'" *City of Atlanta v. McKinney*, 454 S.E.2d 517, 520 (Ga. 1995) (quoting Ga. Code Ann. § 36-35-3(a)). The City's municipal charter grants it "all powers of self-government not specifically prohibited by the constitution, the general laws of the State of Georgia, or by this charter, including all powers . . . necessary or desirable to promote or protect the safety . . . security, good order, . . . and general welfare of the city and of its inhabitants." Charter of Calhoun, Georgia § 1-102(a).

Such broad grant of authority enables the City to regulate bail. In fact, the City already does so. The City requires that, for traffic violations, an "officer,

13

upon receiving the written promise of the alleged violator to answer as specified in the citation, shall release such person from custody." Calhoun Mun. Code § 90-39. Many other municipalities in Georgia act on the same understanding that Georgia law permits them to regulate bail by city ordinance.[2] And Georgia's Uniform Municipal Court Rules, as promulgated by the Supreme Court of Georgia, recognize that "[b]ail in misdemeanor cases shall be set as provided in [State statutes], *and as provided by applicable municipal charter or ordinance*." Ga. Unif. Mun. Ct. R. 18.1 (emphasis added).

The City contends that those municipalities (and presumably itself) are acting in contravention of Georgia law, which, by permitting "the judge of any court of inquiry . . . [to] establish a schedule of bails," Ga. Code Ann. § 17-6-1(f)(1), implicitly strips municipalities of concurrent authority to set bail policy. But reading the statute's permissive grant of authority to courts to establish bail schedules as implicitly preempting all municipal regulation of bail is hardly a plausible interpretation. Like the district court, we are unwilling to conclude that Georgia cities setting bail by ordinance are flouting State law or that the Supreme Court of Georgia incorrectly interpreted Georgia law when it promulgated Uniform

---

[2] *See, e.g.*, Albany Mun. Code § 22-164; Doraville Mun. Code § 11-1; Kennesaw Mun. Code § 38-46; Nashville Mun. Code § 17-1; Smyrna Mun. Code § 34-49(a); Stockbridge Mun. Code § 2.20.080.

14

Municipal Court Rule 18.1. The district court did not clearly err, then, in finding that the City could directly regulate bail if it wished to and so may be held responsible for acquiescing in an unconstitutional policy and practice by its Municipal Court and its police.[3]

Based on the plain meaning of Georgia law and the thin factual record before us at this preliminary stage, we are unpersuaded that the City is immune from § 1983 liability for the bail policy prevailing within its jurisdiction.[4]

### III

Turning to the merits, the City contends that the district court erred in finding the Standing Bail Order to be unconstitutional, a conclusion that led to the district court's issuance of the injunction now before us. The City argues that we should vacate this injunction.

---

[3] Although we need not resolve the validity of a secondary basis for liability, we note that there was also significant support for the district court's finding that the City can set bail policy through its control of its police department. Georgia law provides that, in misdemeanor cases, "constables shall accept bail in such reasonable amount as may be just and fair for any person or persons charged with a misdemeanor." Ga. Code Ann. § 17-6-2(b); *see also* Ga. Code Ann. § 42-4-1(b) ("[C]hiefs of police are the jailers of the municipal corporations . . . ."). In this very case, Walker was asked to post bail by the police department many days before he was slated to have any interaction with the Municipal Court. Other Georgia cities seem to agree with the district court that they may empower their police to make bail policy determinations. *See, e.g.*, Jonesboro Mun. Code § 30-18; LaGrange Mun. Code § 5-20-13; Madison Mun. Code § 34-47; Thomaston Mun. Charter § 25; Warner Robins Mun. Code § 15-8.

[4] Although the materials with which Walker proposes to supplement the record "will not conclusively resolve" the issue of § 1983 liability, they are helpful to us "in the aid of making an informed decision," *Young v. City of Augusta, Ga. ex rel. DeVaney*, 59 F.3d 1160, 1168 (11th Cir. 1995), so his Motion to Supplement the Record (Doc. No. 72) is **GRANTED**.

As the party seeking a preliminary injunction, Walker bore the burden of establishing that he has a substantial likelihood of success on the merits.[5] *Wreal*, 840 F.3d at 1247.  The validity of the injunction thus turns on whether Walker did in fact show that he was likely to succeed in establishing that the City's bail policy was unconstitutional.

The district court ruled that the City's bail policy ran afoul of the Fourteenth Amendment because "[a]ny bail or bond scheme that mandates payment of pre-fixed amounts for different offenses to obtain pretrial release, without any consideration of indigence or other factors, violates the Equal Protection Clause." *Walker I*, 2016 WL 361612, at *10.  Although the district court considered the Standing Bail Order to be "a step in the right direction" over the prior policy, it found that "[t]he Standing Bail Order . . . still violates the Constitution insofar as it permits individuals who have sufficient resources to post a bond (or to have one posted for them) to be released immediately, while individuals who do not have

---

[5] A party seeking a preliminary injunction must make four necessary showings:

> (1) [he] has a substantial likelihood of success on the merits; (2) irreparable injury will be suffered unless the injunction issues; (3) the threatened injury to the movant outweighs whatever damage the proposed injunction may cause the opposing party; and (4) if issued, the injunction would not be adverse to the public interest.

*Wreal*, 840 F.3d at 1247 (quoting *Siegel v. LePore*, 234 F.3d 1163, 1176 (11th Cir. 2000) (en banc)).  Although the parties dispute all four elements, the principal point of dispute is likelihood of success on the merits.

16

those resources must wait forty-eight hours for a hearing." *Walker III*, 2017 WL 2794064, at *3.

The City argues that the district court applied the wrong legal standard in two ways:  first, by analyzing this case under the Fourteenth Amendment rather than the Eighth Amendment; and second, by applying too exacting a form of scrutiny to the City's bail policy.  We consider each challenge in turn.

A

First, the City, and amici supporting it, contend that we should evaluate this dispute only under the Eighth Amendment, which provides that "[e]xcessive bail shall not be required."[6]  U.S. Const. amend. VIII.  As they point out, the Supreme Court has held that, in § 1983 suits, "[t]he validity of the claim must . . . be judged by reference to the specific constitutional standard which governs that right." *Graham v. Connor*, 490 U.S. 386, 394 (1989).  They argue that the right at issue here is the protection against excessive bail, so the Eighth Amendment standard applies.

---

[6] The Excessive Bail Clause has never expressly been incorporated by the Supreme Court to apply to the States.  Because neither party disputes the point, however, we follow the Supreme Court's lead in assuming it has been incorporated.  *See Schilb v. Kuebel*, 404 U.S. 357, 365 (1971) ("[T]he Eighth Amendment's proscription of excessive bail has been assumed to have application to the States through the Fourteenth Amendment."); *McDonald v. City of Chicago*, 561 U.S. 742, 764 & n.12 (2010) (explaining that the Court has "incorporated almost all of the provisions of the Bill of Rights" and suggesting in a footnote that the "prohibition against excessive bail" was incorporated by *Schilb*).

17

1

If the City is correct that the Eighth Amendment standard governs, not only did the district court commit legal error by instead applying equal protection and due process standards, but the City will be on favorable terrain. In *Stack v. Boyle*, the Supreme Court explained that "bail set at a figure higher than an amount reasonably calculated to ensure the defendant's presence at trial is 'excessive' under the Eighth Amendment." *United States v. Salerno*, 481 U.S. 739, 752 (1987) (internal quotation marks and alterations omitted) (quoting *Stack v. Boyle*, 342 U.S. 1, 5 (1951)). But the Excessive Bail Clause "says nothing about whether bail shall be available at all," and it is meant "'merely to provide that bail shall not be excessive in those cases where it is proper to grant bail.'" *Id.* at 752, 754 (quoting *Carlson v. Landon*, 342 U.S. 524, 545 (1952)).

In applying that standard, we have implicitly held that bail is not excessive under the Eighth Amendment merely because it is unaffordable. In *United States v. James*, we considered a case in which the district court set a $2 million cash or surety bond requirement, which the defendants did not have the ability to pay. 674 F.2d 886, 888 (11th Cir. 1982). We rejected their Eighth Amendment challenge to that bail condition, holding that "[t]he basic test for excessive bail is whether the amount is higher than reasonably necessary to assure the accused's presence at

18

trial," and that "[a]s long as the primary reason in setting bond is to produce the defendant's presence, the final amount, type, and other conditions of release are within the sound discretion of the releasing authority." *Id.* at 891. If such standard applied to this case, Walker would have a difficult time showing that his $160 bail amount was unconstitutional.

2

The district court was correct, however, to evaluate this case under due process and equal protection rubrics rather than the Eighth Amendment. The decisive case is *Pugh v. Rainwater*, in which the former Fifth Circuit considered en banc whether, "in the case of indigents, equal protection standards require a presumption against money bail." 572 F.2d 1053, 1056 (5th Cir. 1978) (en banc).[7] The court "accept[ed] the principle that imprisonment solely because of indigent status is invidious discrimination and not constitutionally permissible." *Id.* at 1056. It recognized that "[r]esolution of the problems concerning pretrial bail requires a delicate balancing of the vital interests of the state with those of the individual," as the State "has a compelling interest in assuring the presence at trial

---

[7] In *Bonner v. City of Prichard*, 661 F.2d 1206, 1209 (11th Cir. 1981) (en banc), we adopted as binding precedent all decisions of the former Fifth Circuit handed down prior to October 1, 1981.

of persons charged with crime," while "individuals remain clothed with a presumption of innocence and with their constitutional guarantees intact." *Id.*

Weighing those competing interests, the court observed that "[t]he demands of equal protection of the laws and of due process prohibit depriving pre-trial detainees of the rights of other citizens to a greater extent than necessary to assure appearance at trial and security of the jail." *Id.* at 1057 (quoting *Rhem v. Malcolm*, 507 F.2d 333, 336 (2d Cir. 1974)). Therefore, "[t]he incarceration of those who cannot" meet a master bond schedule's requirements, "without meaningful consideration of other possible alternatives, infringes on both due process and equal protection requirements." *Id.*

Walker's claim, and the district court's mode of analysis, therefore fits squarely within the type of hybrid due process and equal protection claim that *Rainwater* recognized. Walker's allegation is precisely that the City is violating the "demands of equal protection of the laws and of due process" by depriving indigent "pre-trial detainees of the rights of other citizens to a greater extent than necessary." *Id.* (internal quotation marks omitted). In fact, the contemporary Fifth Circuit recently applied *Rainwater* in a case similar to Walker's to reject the defendant's contention that relief can be accorded only under the Eighth Amendment. *See ODonnell v. Harris Cty.*, 892 F.3d 147, 157 (5th Cir. 2018).

20

3

We are cognizant that the Supreme Court's *Graham* decision "requires that if a constitutional claim is covered by a specific constitutional provision, such as the . . . Eighth Amendment, the claim must be analyzed under the standard appropriate to that specific provision, not under the rubric of substantive due process." *United States v. Lanier*, 520 U.S. 259, 272 n.9 (1997).  But Walker's claim, like the plaintiffs' in *Rainwater*, is different.  It challenges not the amount and conditions of bail *per se*, but the process by which those terms are set, which Walker alleges invidiously discriminates against the indigent.

Claims of unlawful discrimination against the indigent in criminal proceedings have a long pedigree in Fourteenth Amendment case law.[8]  The Supreme Court synthesized that law in *Bearden v. Georgia*, which considered "whether the Fourteenth Amendment prohibits a State from revoking an indigent defendant's probation for failure to pay a fine and restitution."  461 U.S. 660, 661

---

[8] *See Griffin v. Illinois*, 351 U.S. 12 (1956) (States cannot condition the right to appeal on ability to afford transcript); *Williams v. Illinois*, 399 U.S. 235, 244 (1970) ("[T]he Equal Protection Clause of the Fourteenth Amendment requires that the statutory ceiling placed on imprisonment for any substantive offense be the same for all defendants irrespective of their economic status."); *Tate v. Short*, 401 U.S. 395, 398 (1971) ("[T]he Constitution prohibits the State from imposing a fine as a sentence and then automatically converting it into a jail term solely because the defendant is indigent and cannot forthwith pay the fine in full." (internal quotation marks omitted)); *Frazier v. Jordan*, 457 F.2d 726, 726, 728 (5th Cir. 1972) (municipal court may not "constitutionally impose a sentence requiring an indigent defendant to pay a fine forthwith or serve a specified number of days in jail" because "[t]hose with means avoid imprisonment; the indigent cannot escape imprisonment").

21

(1983).  The Court explained that "[d]ue process and equal protection principles converge in the Court's analysis" of cases where defendants are treated differently by wealth, observing that "we generally analyze the fairness of relations between the criminal defendant and the State under the Due Process Clause, while we approach the question whether the State has invidiously denied one class of defendants a substantial benefit available to another class of defendants under the Equal Protection Clause."  *Id*. at 665.  Applying such principles, the Court held that:

> [o]nly if alternate measures are not adequate to meet the State's interests in punishment and deterrence may the court imprison a probationer who has made sufficient bona fide efforts to pay.  To do otherwise would deprive the probationer of his conditional freedom simply because, through no fault of his own, he cannot pay the fine.

*Id*. at 672–73.

The *sine qua non* of a *Bearden-* or *Rainwater*-style claim, then, is that the State is treating the indigent and the non-indigent categorically differently.  Only someone who can show that the indigent are being treated systematically worse "solely because of [their] lack of financial resources," *id.* at 661—and not for some legitimate State interest—will be able to make out such a claim.  Those who simply find their own bail conditions too onerous must proceed under the Eighth Amendment's Excessive Bail Clause unless they can point to a separate due process violation.

22

Because Walker's claim indeed rests on an allegation of categorically worse treatment of the indigent, it falls within the *Bearden* and *Rainwater* framework, and the district court was correct to apply those cases' hybrid analysis of equal protection and due process principles.

B

The City further contends that the district court applied the wrong legal standard by imposing too high a level of scrutiny in its equal protection and due process analysis. The City argues that only rational basis review should apply because there is no suspect classification involved or fundamental right at stake. Although somewhat ambiguous about what form of scrutiny it was applying, the district court was clear that it believed some form of heightened scrutiny applied to this case. *See Walker III*, 2017 WL 2794064, at *3 n.2.

1

The district court acknowledged that "generally, an individual's indigence does not make that individual a member of a suspect class," but it contended that "detention based on wealth is an exception to the general rule that rational basis review applies to wealth-based classifications." *Id.* (internal quotation marks omitted). In the district court's view, because the Standing Bail Order treated differently those who could afford immediately to pay the bail schedule amount

23

and those who could not, it was subject to heightened scrutiny. *See id.* at \*3 & n.2. Walker has fully embraced the district court's reasoning, going so far as to argue that that the use of a bail schedule is analogous to the City's imposing "pretrial detention only for black, female, or Catholic arrestees."

But such argument runs headlong into *Rainwater*. There, the court approved the "[u]tilization of a master bond schedule" without applying any heightened form of scrutiny. *Rainwater*, 572 F.2d at 1057. It explained that a bond schedule "provides speedy and convenient release for those who have no difficulty in meeting its requirements." *Id.* Of course, if the bond schedule provided "speedy" release to those who could meet its requirements, it necessarily provided less speedy release to those who could not. Nevertheless, the *Rainwater* court upheld the scheme because it gave indigent defendants who could not satisfy the master bond schedule a constitutionally permissible secondary option: a bail hearing at which the judge could consider "all relevant factors" when deciding the conditions of release. *See id.* at 1058.[9]

---

[9] The dissent does not grapple meaningfully with *Rainwater*'s explicit approval of bail schedules. The most it does is to argue that the bail system reviewed in *Rainwater* is different from the City's because it "subjected indigent and non-indigent arrestees alike to a first appearance." Dissent at 73. The dissent would thus turn *Rainwater* on its head. *Rainwater* endorsed the use of a bail schedule to provide "speedy and convenient release," but the dissent would transform that endorsement into a requirement that all arrestees be held for a hearing even if they can immediately satisfy the release conditions. That is, to say the least, an odd reading of *Rainwater*. In any event, the dissent is wrong that Florida's scheme required all persons to wait

*(continued on next page)*

24

*Rainwater*'s conclusion is consistent with Supreme Court case law on how differential treatment by wealth is analyzed under the Equal Protection Clause. The definitive explanation comes from *San Antonio Independent School District v. Rodriguez*, which considered a wealth-based equal protection challenge to Texas's system of apportioning school funds based principally on local tax bases. 411 U.S. 1 (1973). Analyzing prior cases, with a focus on *Bearden*'s antecedents, the Court concluded that instances where wealth-based distinctions were impermissible "shared two distinguishing characteristics: because of their impecunity[, the indigent] were completely unable to pay for some desired benefit, and as a consequence, they sustained *an absolute deprivation* of a meaningful opportunity to enjoy that benefit." *Id*. at 20 (emphasis added). Mere diminishment of a benefit was insufficient to make out an equal protection claim: "[A]t least where wealth is involved, the Equal Protection Clause does not require absolute equality or precisely equal advantages." *Id.* at 24.

Other cases bolster the line drawn in *Rodriguez* between mere diminishment of some benefit and total deprivation based solely on wealth. In *Ross v. Moffitt*,

---

for a bail hearing, as it only required such a hearing for those who had not "been previously released in a lawful manner." *In re Fla. Rules of Criminal Procedure*, 272 So. 2d 65, 81 (Fla. 1972) (Rule 3.130(b)(1)).

417 U.S. 600, 616 (U.S. 1974), the Court explained that in criminal proceedings involving indigents, "[t]he duty of the State . . . is not to duplicate the legal arsenal that may be privately retained by a criminal defendant . . ., but only to assure the indigent defendant an adequate opportunity to present his claims fairly." In *M.L.B. v. S.L.J.*, 519 U.S. 102 (1996), the Court explained the *Bearden* line of cases to mean that wealth-based sanctions are impermissible when they are "not merely *disproportionate* in impact," but "[r]ather, they are wholly contingent on one's ability to pay." *Id.* at 127. In *McGinnis v. Royster*, the Supreme Court considered an equal protection challenge to a New York sentencing scheme that gave good-behavior credit on an equal basis to those who had and had not been bailed before trial, even though those who could not afford pretrial bail had already spent time incarcerated in jail. 410 U.S. 263 (1973). The Court "inquire[d] only whether the challenged distinction *rationally* furthers some *legitimate*, articulated state purpose." *Id.* at 270 (emphasis added). It upheld the scheme because jails lacked the rehabilitative programs of prisons, which provided "a rational justification"—independent of wealth—"for declining to give good-time credit" for pretrial time served in jail. *Id.* at 273. *Ross*, *M.L.B*, and *McGinnis*, then, all bolster the principle that differential treatment by wealth is impermissible only where it results in a *total* deprivation of a benefit *because* of poverty.

26

Under the Standing Bail Order, Walker and other indigents suffer no "absolute deprivation" of the benefit they seek, namely pretrial release. Rather, they must merely wait some appropriate amount of time to receive the same benefit as the more affluent.[10] Indeed, after such delay, they arguably receive preferential treatment, in at least one respect, by being released on recognizance without having to provide any security. Such scheme does not trigger heightened scrutiny under the Supreme Court's equal protection jurisprudence.

Nor do we see how it could. If Walker were correct that wealth should be treated like race, sex, or religion, and that every policy that affects people differently based on ability to pay must be justified under heightened scrutiny, the courts would be flooded with litigation. Innumerable government programs— heretofore considered entirely benign—would be in grave constitutional danger. If the Postal Service wanted to continue to deny express service to those unwilling or unable to pay a fee, it would have to justify that decision under the same standard it would have to meet to justify providing express service only to white patrons. The University of Georgia would be unable to condition matriculation on ability to pay

---

[10] This case is therefore quite factually distinct from *ODonnell*, in which the government "did not achieve any individualized assessment in setting bail," and as a result "some amount of upfront payment [was] required for release in the vast majority of cases," thereby "ensuring that [indigent] arrestees would remain detained." 892 F.3d at 153–54. The Standing Bail Order lacks such features that could support a conclusion that there is an "absolute deprivation" of pretrial release.

27

tuition unless it could meet the same constitutional standard that would allow it to deny admission to Catholics. In Walker's preferred constitutional world, taxes that are independent of income, such as property taxes or sales taxes, would be the target of perpetual litigation. All that is to say, we do not believe that *Bearden* or *Rainwater* announced such radical results with so little fanfare, and we therefore reject Walker's equal protection theory. The district court was wrong to apply heightened scrutiny under the Equal Protection Clause.

2

As an alternative basis for applying heightened scrutiny, Walker defends the district court on the ground that "the City's bail system infringes the fundamental right to pretrial liberty." He argues this is so under the Due Process Clause, pointing to *United States v. Salerno*, in which the Supreme Court considered the federal Bail Reform Act's provision for preventative detention of dangerous defendants. 481 U.S. at 741. In *Salerno*, the Court recognized that "[i]n our society liberty is the norm, and detention prior to trial or without trial is the carefully limited exception," *id.* at 755; but it also stated that an arrestee may be incarcerated before trial "if he presents a risk of flight or a danger to witnesses," *id.* at 749 (citing *Bell v. Wolfish*, 441 U.S. 520, 534 (1979)). The Court ultimately permitted preventative detention if the arrestee "pose[s] a threat to the safety of

28

individuals or to the community which no condition of release can dispel." *Id.* at 755. Walker contends that this form of analysis is tantamount to heightened scrutiny and that it should be applied to his case.

But the *Salerno* Court's analysis was much closer to a relatively lenient procedural due process analysis than it was any form of heightened scrutiny. Rather than asking if preventative detention of dangerous defendants served a compelling or important State interest and then demanding relatively narrow tailoring, the Court employed a general due process balancing test between the State's interest and the detainee's. *See id.* at 746–51. The Court's analysis borrowed heavily from a prior decision, *Schall v. Martin*, in which the Court upheld preventative detention of likely-to-reoffend juveniles based on an analysis that asked "whether preventative detention . . . is compatible with the 'fundamental fairness' required by due process." 467 U.S. 253, 263 (1984). Answering that question required "[t]wo separate inquiries[:] . . . First, does preventive detention . . . serve a legitimate state objective? And, second, are the procedural safeguards . . . adequate to authorize the pretrial detention?" *Id.* at 263–64 (citations omitted). That analysis is a far cry from strict—or even intermediate—scrutiny.

Moreover, even if *Salerno* did embrace a form of heightened scrutiny, we do not believe it applies to this case because the City is not seeking to impose any

29

form of preventative detention.  Here, Walker himself was released, and the Standing Bail Order presently guarantees release within 48 hours of arrest to all indigent defendants in Walker's shoes.  In a future case that raises the question whether a municipality may detain an indigent defendant because no feasible release conditions will assure his appearance in court, perhaps *Salerno*'s framework might apply.[11]  But that is not the question before us in this limited interlocutory appeal.

3

The appropriate level of scrutiny is the point of departure for the dissent, and its contrary conclusion on that issue is the foundation for the rest of its analysis.

---

[11] There is some force to the City's contention that such analysis is inextricably linked to the excessiveness of bail conditions and so should be evaluated under the Eighth Amendment. Indeed, the Eighth Amendment was borrowed from a provision of the English Bill of Rights that was itself the culmination of a long process to prevent royal abuses of bail wrongly to deny pretrial liberty.  *See, e.g.*, William F. Duker, *The Right to Bail: A Historical Inquiry*, 42 Alb. L. Rev. 33, 63–66 (1977); *see also* June Carbone, *Seeing through the Emperor's New Clothes: Rediscovery of Basic Principles in the Administration of Bail*, 34 Syracuse L. Rev. 517, 529–33 (1983) (noting that the early American experience was to adopt and then further to liberalize British legal principles governing bail); *id.* at 548–49 ("In England, the colonies, and the early states, bail bonds were set without reference to the financial circumstances of the accused. Lower bonds for the poor were considered to violate, not vindicate, the principle of equal justice.").

Such history may support reinvigorating the Eighth Amendment as the proper vehicle for evaluating whether a State has imposed impermissible conditions of pretrial release. *Cf. Lopez-Valenzuela v. Arpaio*, 770 F.3d 772, 805–07 (9th Cir. 2014) (en banc) (O'Scannlain, J., dissenting) (arguing that legislation governing pretrial detention based on flight risk should be evaluated under the Eighth Amendment).  In any event, it will be for a future court to decide whether *Salerno*'s framework or an Eighth Amendment analysis applies when a defendant is eligible for bail but is detained because he cannot provide adequate assurance of his future appearance.

The dissent would adopt Walker's theory that any marginal increase in the length of detention attributable to inability to pay bail amounts to invidious discrimination warranting heightened scrutiny. As we have explained, accepting that premise effectively abandons the limitations on wealth-based equal protection claims drawn in *Rodriguez* and its successors.

The dissent provides a hypothetical that proves how far it would go. It asks us to consider two persons arrested for the same crime under the same circumstances, whose sole difference is the amount of money each has. The dissent says there is an equal protection problem because: "The person who has money pays it *and walks away*. The indigent can't pay, so he *goes to jail*." Dissent at 57 (emphasis added). But this hypothetical could apply to any government benefit contingent on ability to pay, including all the examples we used above. To illustrate, let's simply switch out, by substituting the italicized phrases, the dispensation sought by the hypothetical persons:

"The person who has money pays it and *gets express postal service*. The indigent can't pay, so he *goes with snail mail*."

"The person who has money pays it and *matriculates at the state university*. The indigent can't pay, so he *stays home*."

31

"The person who has money pays it and *satisfies his property tax bill*. The indigent can't pay, so he *loses his home to a tax foreclosure*."

Any government benefit or dispensation can be framed in artificially narrow fashion to transform a diminishment into total deprivation. The dissent takes the interest identified by *Rainwater*—the "right to freedom before conviction," or the "right to bail before trial," 572 F.2d at 1056–56—and narrows it to something like "the right not to be held a moment longer than a person who can satisfy a bail schedule." If such narrowing is permissible, then any wealth-based equal protection claim becomes valid so long as the plaintiff frames his interest in a cramped enough style. Under the dissent's theory, then, the only reason the *Rodriguez* plaintiffs' equal protection claim failed was that they challenged overall disparities in school budgets (which was what they actually cared about). If instead they had focused on something smaller and less important—perhaps claiming that differences in school district funding completely deprived them of specialized art classes—then, in the dissent's world, they would have prevailed. That turns the Equal Protection Clause into a game of word play, a result inconsistent with the thrust of *Rodriguez* and its successors.

Recognizing its tension with *Rodriguez*, the dissent suggests that Walker's claim could fit into a "narrow exception" to the general rule against applying

32

heightened scrutiny to wealth-based equal protection arguments.  Dissent at 66.

But the dissent provides no limiting principle to such an exception. Although it

suggests "access to judicial processes in [criminal] cases" as one category of

exception, *id.* (quoting *M.L.B.*, 519 U.S. at 124), it does not explain what judicial

proceeding an indigent person *cannot* access by the terms of the Standing Bail

Order.  More critically, as just demonstrated, the dissent's analysis is not amenable

to so narrow an exception and would apply to any government action that treats

people of different means differently.  Disparate treatment based on wealth, in the

dissent's constitutional methodology, would be treated the same as official

religious or racial discrimination.  The Supreme Court has rejected so radical an

application of the Equal Protection Clause, *see Rodriguez*, 411 U.S. at 24, and we

cannot adopt it on the unprincipled ad hoc basis urged by the dissent.

Perhaps the basis for the dissent's proposed "narrow exception" could be the

importance to indigents of being released from jail.  But that quickly starts to

sound like a claim based on a fundamental liberty interest, and the dissent has

disavowed reliance on Walker's substantive due process argument.  *See* Dissent at

67 n.8.  Perhaps that is so as to elide *Salerno* and *Schall*.  Although the dissent

formally relies only on the Equal Protection Clause, however, its tenor reveals that

it is motivated by the importance of Walker's liberty interest, and it persuasively

33

describes at length the value of pretrial liberty. *See* Dissent at 61–62. We do not

for a moment doubt the value of freedom from jail. But the Supreme Court in

*Salerno* made clear that the government also has important interests at stake when

considering whether to release an accused who may be a flight risk or public

danger. Accordingly, it has instructed us to apply a less demanding level of

scrutiny than the one necessary to support the dissent's conclusions. The dissent

cannot avoid the Supreme Court's holding by smuggling a substantive due process

claim into the Equal Protection Clause.

C

Thus the district court was correct to apply the *Bearden*/*Rainwater* style of

analysis for cases in which "[d]ue process and equal protection principles

converge," *Bearden*, 461 U.S. at 665, yet it was wrong to apply heightened

scrutiny from traditional equal protection analysis.

The confusion is perhaps unsurprising because neither *Bearden* nor

*Rainwater* is a model of clarity in setting out the standard of analysis to apply. As

*Bearden* puts it, the proper analysis "requires a careful inquiry into such factors as

'the nature of the individual interest affected, the extent to which it is affected, the

rationality of the connection between legislative means and purpose, [and] the

existence of alternative means for effectuating the purpose.'" 461 U.S. at 666–67

34

(alteration in original) (quoting *Williams v. Illinois*, 399 U.S. 235, 260 (1970) (Harlan, J., concurring in the result)); *accord Rainwater*, 572 F.2d at 1056 ("Resolution of the problems concerning pretrial bail requires a delicate balancing of the vital interests of the state with those of the individual.").

We take *Bearden*'s quotation of Justice Harlan's *Williams* concurrence as a sign that the *Bearden* Court shared his assessment that these kinds of questions should be evaluated along something akin to a traditional due process rubric. *See Williams*, 399 U.S. at 260 (Harlan, J., concurring in the result) ("An analysis under due process standards, correctly understood, is . . . more conducive to judicial restraint than an approach couched in slogans and ringing phrases . . . that blur analysis by shifting focus away from the nature of the individual interest affected."). That makes particular sense in this case because the relief Walker seeks is essentially procedural: a prompt process by which to prove his indigency and to gain release.

In such due process analysis, "[t]he fundamental requirement . . . is the opportunity to be heard at a meaningful time and in a meaningful manner." *Mathews v. Eldridge*, 424 U.S. 319, 333 (1976) (internal quotation marks omitted). Due process "is not a technical conception with a fixed content unrelated to time, place and circumstances," but rather is "flexible" and "requires analysis of the

35

governmental and private interests that are affected." *Id.* at 334 (internal quotation marks omitted). The district court should have applied such analysis in evaluating whether the Standing Bail Order comported with the Constitution's equal protection and due process guarantees.

## IV

Having established that *Bearden* and *Rainwater* command that courts should apply something akin to a procedural due process mode of analysis to claims like Walker's, it remains to be determined whether the district court acted within its discretion in entering its preliminary injunction. At this stage of litigation, the City seeks to overturn the preliminary injunction in order to maintain the Standing Bail Order, so we must focus our inquiry on the concrete distinctions between the preliminary injunction and the Standing Bail Order.

Under the Standing Bail Order, arrestees are guaranteed a hearing within 48 hours of arrest to prove their indigency (with court-appointed counsel) or they will be released. *See supra* Part I.B. In contrast, the preliminary injunction commands an affidavit-based process for determining indigency within 24 hours of arrest. *See supra* Part I.C.3. Both procedures agree on the standard for indigency and that those found indigent are to be released on recognizance. There are thus only two real points of dispute. First, whether the City must make an indigency

36

determination within 24 hours or 48 hours.  Second, whether the City may use a judicial hearing to determine indigency or must use the affidavit-based system required by the preliminary injunction.

A

Within what time must the City make an indigency determination?  To answer this question, the City asks us not to write on a blank slate but to borrow from Supreme Court precedent on the timing required for a probable cause determination.  In *County of Riverside v. McLaughlin*, the Supreme Court considered what "prompt" meant for providing a constitutionally required prompt probable cause hearing for those arrested without a warrant.  500 U.S. 44, 55 (1991).  "Taking into account the competing interests" of the individual and the government, the Court concluded that "a jurisdiction that provides judicial determinations of probable cause *within 48 hours of arrest* will, as a general matter, comply with the promptness requirement."  *Id.* at 56 (emphasis added).  The *McLaughlin* Court expressly rejected a 24-hour bright-line limitation suggested by Justice Scalia in dissent.  *See id.* at 57–58.

Walker argues that we should not import *McLaughlin*'s 48-hour presumption into the bail context because that case did not involve differential treatment based on wealth.  He contends that any disparate treatment by wealth in granting bail

37

must satisfy heightened scrutiny, thereby placing a strict burden on the government to justify its bail policy. That argument fails, however, because, as we explained above, the use of a bail schedule does not trigger heightened scrutiny. Instead, we evaluate the 48-hour window for making bail determinations on its own terms to ensure that it satisfies the due process mode of analysis in *Bearden* and *Rainwater*.

We are persuaded that it does. Under *McLaughlin*, the City can presumptively hold a person for 48 hours before even establishing probable cause—that is, without even proving that it has evidence that he has committed a crime. It stands to reason that that the City can take the same 48 hours to set bail for somebody held *with* probable cause. Indeed, *McLaughlin* expressly envisioned that one reason for the 48-hour window is so that probable cause hearings could be combined with "bail hearings and arraignments." 500 U.S. at 58. For those reasons, the Fifth Circuit in *ODonnell* recently imported the *McLaughlin* 48-hour rule to the bail determination context. 892 F.3d at 160–61. The *ODonnell* court was reviewing an injunction that imposed a 24-hour time limit for a bail determination—identical in that respect to the one we are reviewing—and it rejected such time limit because it worked a "heavy administrative burden" and was therefore "too strict." *Id.*

38

We agree with the Fifth Circuit; indigency determinations for purposes of setting bail are presumptively constitutional if made within 48 hours of arrest.[12] By failing to honor such presumption and insisting instead on a 24-hour window, the district court committed legal error and so abused its discretion.[13]

---

[12] The dissent accuses us of opening a split with the Fifth Circuit's *ODonnell* decision. *See* Dissent at 60 n.5. But it is the dissent's position that would lead to a split. The *ODonnell* court expressly adopted the 48-hour requirement of *McLaughlin*—and, contrary to the dissent's equal protection analysis, it did so based on a due process analysis. *See ODonnell*, 892 F.3d at 160. *ODonnell* held a 24-hour rule too burdensome even though the defendant in that case was Harris County, Texas—home to Houston—which presumably could much more easily provide frequent bail hearings than can the City's one-judge municipal court.

It is true that, in a separate part of its opinion, the *ODonnell* court applied heightened scrutiny under the Equal Protection Clause, after concluding that the facts of that case fit into the *Rodriguez* classification of plaintiffs who suffer an "absolute deprivation of their most basic liberty interests." *Id.* at 162. But there, the court had extensive factual findings from the district court, resulting from a lengthy evidentiary hearing, that Harris County did not provide arrestees "*any* opportunity to submit evidence of relative ability to post bond at the scheduled amount," *id.* at 154 (emphasis added), evidence that permitted the Fifth Circuit to conclude that the County acted with a "discriminatory purpose" that "resulted in [indefinite] detainment solely due to a person's indigency," *id.* at 161. Were the facts of this case the same, Walker would have a much stronger argument that indigents in the City face an absolute deprivation on account of wealth that would trigger the *Rodriguez* exception, but the Standing Bail Order guarantees release to indigents within 48 hours. It therefore accords entirely with *ODonnell*'s holding that what the Constitution requires is "an opportunity to be heard and submit evidence within 48 hours of arrest, and a reasoned decision by an impartial decisionmaker." *Id.* at 163. The dissent would demand more and so is inconsistent with *ODonnell*.

[13] We note, however, that we do not consider whether Walker can show that the facts of his particular case (or other class members') fall outside the *McLaughlin* safe harbor. The *McLaughlin* Court made clear that the 48-hour presumption was rebuttable: a probable cause hearing held within 48 hours may nonetheless be unconstitutional "if the arrested individual can prove that his or her probable cause determination was delayed unreasonably." *McLaughlin*, 500 U.S. at 56. "Examples of unreasonable delay" include "delays for the purpose of gathering additional evidence to justify the arrest, a delay motivated by ill will against the arrested individual, or delay for delay's sake." *Id.* *McLaughlin* only provides that jurisdictions which comply with the 48-hour rule "will be immune from *systemic* challenges." *Id.* (emphasis added). That being said, the *McLaughlin* Court cautioned that, "[i]n evaluating whether the delay in a particular case is unreasonable, . . . courts must allow a substantial degree of flexibility." *Id.*

*(continued on next page)*

B

The City also challenges the preliminary injunction's command to adopt an affidavit-based process for determining indigency, which overrode the Standing Bail Order's system based on judicial bail hearings before the Municipal Court. Walker defends the injunction by arguing that the City never provided a reason that a judicial hearing was preferable to the affidavit-based process. He also contends that the choice of an affidavit-based process was a reasonable option within the district court's sound discretion for fashioning equitable relief. Notably, neither Walker nor the district court's order provides any legal authority for the

---

Nor do we decide whether a jurisdiction could adopt a system that allows a longer period of time than 48 hours to make a bail determination, because the City does not seek to take longer than 48 hours. As amicus pointed out at oral argument, the federal system permits a court to delay a bail hearing by three days after an arrestee's first appearance (plus intervening weekends or holidays) upon the government's motion. *See* 18 U.S.C. § 3142(f). And Georgia law allows 72 hours for an officer making an arrest pursuant to a warrant to bring the arrestee before a judicial officer. *See* Ga. Code Ann. § 17-4-26. Whether such lengths of delay are permissible is not a question before us. We are satisfied that *McLaughlin* establishes at least a 48-hour presumptive safe harbor for making bail determinations without deciding if that safe harbor extends longer. Because a probable cause determination establishes whether the government has a basis to detain a person at all, *see Gerstein*, 420 U.S. at 125, the onus on the government to make a probable cause determination promptly must be at least as great as it is to set the conditions of pretrial release. Whether jurisdictions have greater leeway in making bail determinations than probable cause determinations is a question for another case with a more complete factual record. The dispute between the parties over whether the preliminary injunction led to an increase in the non-appearance rate in the City may be relevant to such inquiry,  but we need not resolve that dispute to determine that the Standing Bail Order facially passes constitutional muster.

40

proposition that the Constitution requires the affidavit-based process in lieu of a judicial hearing.

Indeed, the law cuts the other way and indicates that federal courts should give States wide latitude to fashion procedures for setting bail. Directly on point, the bail rule upheld in *Rainwater* was based on formal hearings at which judges would consider the arrestee's financial resources, just as the Standing Bail Order provides. *See Rainwater*, 572 F.2d at 1055 & n.2 (citing Fla. R. Crim. P. 3.130(b) (1977)); *id.* at 1058 & n.8.

Even if *Rainwater* were not dispositive, however, there is no constitutional basis for the district court's imposition of its preferred method of setting bail. In the context of probable cause determinations, the Supreme Court has "recognized that 'state systems of criminal procedure vary widely' in the nature and number of pretrial procedures they provide," and it has "noted that there is no single 'preferred' approach." *McLaughlin*, 500 U.S. at 53 (quoting *Gerstein*, 420 U.S. at 123). The Court explained that "'flexibility and experimentation by the States'" is "desirable and that each State should settle upon an approach 'to accord with [the] State's pretrial procedure viewed as a whole.'" *Id.* (alteration in original) (quoting *Gerstein*, 420 U.S. at 123). Respecting that flexibility gives "proper deference to the demands of federalism." *Id.* The same logic applies to bail determinations,

41

and the district court provided no justification for substituting its preferred policy for the City's.

Indeed, the City may have had good reasons for preferring a judicial hearing to a purely paper-based process for evaluating indigency. It may reasonably prefer that a judge have the opportunity to probe arrestees' claims of indigency in open court, where the importance of honesty may more clearly be impressed on the arrestee than would be the case in filling out an affidavit in the jailhouse. In more complex cases, a judicial hearing would allow the court iteratively to examine with the arrestee, his counsel, and the government what conditions of release are reasonable and within the arrestee's means, thereby tailoring case-specific conditions of release that balance the individual's pretrial liberty interest with the government's interest in assuring his subsequent appearance.

Parallel areas of case law support the reasonableness of the Standing Bail Order's preference for judicial hearings. The Supreme Court's Eighth Amendment jurisprudence envisions that bail determinations will be made at judicial hearings. *See Stack*, 342 U.S. at 6 ("If bail in an amount greater than that usually fixed . . . is required . . ., that is a matter to which evidence should be directed *in a hearing* so that the constitutional rights of each petitioner may be preserved." (emphasis added)). And in the procedural due process context, "[t]he judicial model of an

42

evidentiary hearing" is treated as the most extensive form of process that can be required. *Mathews*, 424 U.S. at 348; *see also Goldberg v. Kelly*, 397 U.S. 254, 269 (1970) ("[W]ritten submissions do not afford the flexibility of oral presentations; they do not permit the recipient to mold his argument to the issues the decision maker appears to regard as important. Particularly where credibility and veracity are at issue, . . . written submissions are a wholly unsatisfactory basis for decision.").

Whatever limits may exist on a jurisdiction's flexibility to craft procedures for setting bail, it is clear that a judicial hearing with court-appointed counsel is well within the range of constitutionally permissible options. The district court's unjustified contrary conclusion was legal error and hence an abuse of discretion.

## C

In sum, Walker failed to make the necessary showing that he is likely to succeed on the merits of his claim that the Standing Bail order is unconstitutional. Neither the 48-hour window for a bail determination nor the use of an adversarial bail hearing in lieu of an affidavit-based process runs afoul of the Constitution. Walker therefore failed to satisfy one of the necessary conditions for a preliminary injunction against the Standing Bail Order, *Wreal*, 840 F.3d at 1247, and the district court erred in granting it.

V

As a fallback position, Walker further asks us to defer to the "breadth and flexibility" of the district court's equitable power to cure constitutional violations that arose prior to the issuance of the Standing Bail Order. *Brown v. Plata*, 563 U.S. 493, 538 (2011) (internal quotation marks omitted). Walker contends that because the City's original bail policy, in place at the time the litigation was initiated, was plainly unconstitutional, it does not matter that the subsequent Standing Bail Order is entirely constitutional. Instead, Walker argues, the existence of an initial constitutionally defective policy gave the district court equitable discretion to insert into a perfectly constitutional subsequent policy additional conditions nowhere required by the Constitution.

A

1

The City's leading counter-argument is that, if the Standing Bail Order is constitutional, then Walker's claim for injunctive relief is entirely moot. The City contends that because a new policy has been promulgated after this litigation began, which supplanted the original policy, the claim against the original policy is now moot, and no relief may follow from it.

44

Walker responds that the dispute over the constitutionality over the City's original bail policy is not moot because, at the conclusion of this litigation, the City may revert to that policy if there is no injunction in place. As noted, early in the litigation, the Municipal Court issued the Standing Bail Order, at which point the City ceased to defend the constitutionality of the original policy. Walker alleges that the City adopted the policy merely to manipulate the district court's jurisdiction and that the Standing Bail Order may be easily repealed when an injunction is no longer hanging over the City. He rejects an inference that the Municipal Court realized the potential constitutional infirmity of the existing bail policy and acted promptly to rectify it.

The district court agreed with Walker. It concluded that the City's adoption of the Standing Bail Order did not moot Walker's suit for injunctive relief against the original bail policy because there was a reasonable expectation that the City might return to its original policy after this litigation ended. *See Walker I*, 2016 WL 361612, at *12. As the district court put it, the request for injunction relief is not moot because "it is not absolutely clear that the allegedly wrongful behavior

45

could not be reasonably expected to recur." *Id.* (quoting *Cook v. Bennett*, 792 F.3d 1294, 1300 (11th Cir. 2015) (internal quotation marks omitted)).[14]

2

"[V]oluntary cessation of allegedly illegal conduct does not deprive the tribunal of power to hear and determine the case, i.e., does not make the case moot." *Flanigan's Enters., Inc. of Ga. v. City of Sandy Springs*, 868 F.3d 1248, 1255 (11th Cir. 2017) (en banc) (internal quotation marks omitted). A case is therefore moot "only when [the court] ha[s] no reasonable expectation that the challenged practice will resume after the lawsuit is dismissed." *Id.* at 1255–56 (internal quotation marks omitted). "[T]he burden of proving mootness generally falls heavily on the party asserting it." *Id.* at 1256.

When a *government* voluntarily ceases the challenged action, however, there is a presumption that the government will not later resume the action, so the plaintiff bears the burden of showing that there is "a reasonable expectation" that the government "will reverse course and reenact the allegedly offensive" policy. *Id.* at 1256. "The key inquiry in this mootness analysis therefore is whether the

---

[14] Whether or not the conceded unconstitutionality of the City's original bail policy could support an injunction on the merits, "we are required to address" the mootness question first because it is jurisdictional: "if a suit is moot, it cannot present an Article III case or controversy and the federal courts lack subject matter jurisdiction to entertain it." *Coral Springs St. Sys., Inc. v. City of Sunrise*, 371 F.3d 1320, 1328 (11th Cir. 2004). "We review the question of mootness *de novo*." *Id.*

46

evidence leads [the court] to a reasonable expectation that the City will reverse course and reenact the allegedly offensive" bail policy after this litigation ends. *Id.*

To determine whether such a reasonable expectation exists, courts look to "three broad factors." *Id.* at 1257. First, "whether the change in conduct resulted from substantial deliberation or is merely an attempt to manipulate our jurisdiction." *Id.* This requires examining "the timing of the repeal, the procedures used in enacting it, and any explanations independent of this litigation which may have motivated it." *Id.* Second, "whether the government's decision to terminate the challenged conduct was 'unambiguous'"—i.e., "whether the actions that have been taken to allegedly moot the case reflect a rejection of the challenged conduct that is both permanent and complete." *Id.* And, third, "whether the government has consistently maintained its commitment to the new policy or legislative scheme." *Id.*

The City's adoption of the Standing Bail Order is somewhat analogous to the mootness issue presented in *Harrell v. The Florida Bar*, 608 F.3d 1241 (11th Cir. 2010). In *Harrell*, the plaintiff challenged the Florida Bar's advertising rules and regulations, including the Bar's specific decision to reject one of the plaintiff's proposed advertising slogans. *Id.* at 1249–50. After the lawsuit began, the Bar reversed its earlier decision and approved the slogan without issuing a reasoned

47

opinion. *Id.* at 1252–53. The district court held that the decision approving the slogan mooted the plaintiff's challenge, but we reversed. *Id.* at 1253, 1268. For the first mootness factor, we observed that the Bar "acted in secrecy, meeting behind closed doors and, notably, fail[ed] to disclose any basis for its decision." *Id.* at 1267. Thus, we had "no idea whether the . . . decision was 'well-reasoned' and therefore likely to endure." *Id.* And because the Bar had changed its position after litigation had begun, "the circumstances . . . raise[d] a substantial probability that" the Bar had "changed course simply to deprive the court of jurisdiction." *Id.* (internal quotation marks omitted). We also concluded that the second factor weighed against the suit's mootness. Because the Bar's decision to approve the slogan was unexplained and had been made through an irregular process, we were "unable to say that the [Bar], through its decision, 'unambiguously terminated' the challenged application" of its rules. *Id.* at 1267. Thus, the Bar's decision was "very much clouded by ambiguity," and we held that "the governmental presumption" did not apply, and the lawsuit was not moot. *Id.* at 1268 (citing *Troiano v. Supervisor of Elections in Palm Beach Cty.*, 382 F.3d 1276 (11th Cir. 2004)).

48

3

Applying such analysis here, we conclude that Walker's claim for injunctive relief against the City's original bail policy is likewise not moot. The first factor—whether the change in conduct resulted from substantial deliberation or is instead an attempt to manipulate jurisdiction—weighs against mootness. While we may doubt that it was the City's intent to manipulate jurisdiction, as opposed to simply correcting a deficient policy, the fact is that the City has been unnecessarily secretive. The process for adopting the Standing Bail Order is unknown because the City has refused to explain that process. In fact, in response to interrogatories, the City asserted that information about "the process of creating" the Standing Bail Order was protected by "the work-product doctrine and/or attorney-client privilege," and it refused to divulge any information except to say that the Order was executed by the Chief Judge of the Municipal Court.

The second factor also weighs against mootness because the City's abandonment of its original bail policy is not unambiguous. The City did not change its bail policy through a legislative act, which might well have mooted the original claim. Instead, a single judge issued the Standing Bail Order and, while it is perhaps unlikely, we cannot say that this judge might not revert to the original policy, given the lack of transparency surrounding the issuance of the Standing

49

Bail Order. Thus, "it can hardly be said that [the City's] 'termination'" of its original bail policy is unambiguous. *Harrell*, 608 F.3d at 1266–67.

Finally, as to the third factor—whether the government has consistently maintained its commitment to the new policy or legislative scheme—that does not cut strongly either way because only two months after the Standing Bail Order was adopted, the district court stopped its implementation with the first preliminary injunction.

Altogether, Walker presented sufficient evidence for the district court to conclude that his challenge to the original bail policy was not moot. Because the City does not defend the constitutionality of its original bail policy on appeal, we may assume that Walker's arguments against the City's original bail policy have a substantial likelihood of success on the merits. Just as the City has not defended its original bail policy on the merits, it also has not shown that the district court abused its discretion when it concluded that the other factors favoring an injunction were met with respect to that original policy. The district court therefore did not err in declaring the original bail policy to be unconstitutional, and it accordingly may enjoin the City's future use of that policy.

50

B

But the conclusion that Walker's claim for injunctive relief against the City's original bail policy is not moot does not mean that the preliminary injunction against the Standing Bail Order is valid.  Even assuming that the City intended to revert to its original policy at the conclusion of this litigation— something that will not occur given the terms of our ruling and remand here—such possibility does not salvage the preliminary injunction.  The district court's rationale for entering the injunction was *not* that the City was likely to walk back the Standing Bail Order, but rather that the Standing Bail Order was itself unconstitutional "insofar as it permits individuals who have sufficient resources to post a bond . . . to be released immediately, while individuals who do not have those resources must wait forty-eight hours for a hearing."  *Walker III*, 2017 WL 2794064, at *3.  As we have explained, that conclusion was based on legal error by (1) failing to recognize a presumption that a bail determination made within 48 hours is constitutionally valid and (2) wrongly assuming that the Equal Protection Clause forbids jurisdictions from offering comparatively speedier release to those able to meet a bail schedule.

Walker essentially asks us to hold that a governmental body that ceases to follow an unconstitutional policy, and that instead promulgates a constitutional

51

policy, is nonetheless and forever forced to comply with an even more stringent policy devised by a district court—with conditions found nowhere in the Constitution—merely because it had once followed an unconstitutional policy.  It would be absurd to so hold.

"A district court abuses its discretion . . . when it applies the incorrect legal standard." *Wreal*, 840 F.3d at 1247.  The district court did so here when it issued its preliminary injunction.  As a result, the preliminary injunction is infirm regardless of the City's motivation for the Standing Bail Order.

C

In sum, because the City did not establish that Walker's suit for injunctive relief was moot and because it has effectively conceded that its original bail policy was unconstitutional, the district court may enjoin a return to that original policy.  But the district court abused its discretion in also enjoining the entirely constitutional Standing Bail Order, so the preliminary injunction cannot stand.

52

VI

For the foregoing reasons, the preliminary injunction entered by the district court is **VACATED**, and the case is **REMANDED** to the district court for further proceedings consistent with this opinion.[15]

---

[15] Because we would vacate the preliminary injunction irrespective of whether the district court was correct to certify Walker's proposed class or whether it properly denied the City's motion to dismiss, such two orders are not "inextricably intertwined" with the preliminary injunction order, and reviewing them is not "necessary to ensure meaningful review" of the preliminary injunction. *Hudson v. Hall*, 231 F.3d 1289, 1294 (11th Cir. 2000) (internal quotation marks and alterations omitted). We therefore lack pendant appellate jurisdiction over such otherwise unappealable interlocutory orders. Accordingly, Walker's Motion to Dismiss Appeal in Part (Doc. No. 16) is **GRANTED**.

MARTIN, Circuit Judge, concurring in part and dissenting in part[1]:

Maurice Walker was jailed by the City of Calhoun for six days because he was too poor to pay his bail. He challenges the City's practice of jailing people before trial when they are too poor to make bond, arguing it violates the constitutional guarantees of due process and equal protection. The Majority rejects this claim, characterizing the pretrial jailing as "merely wait[ing] some appropriate amount of time to receive the same benefit as the more affluent." Maj. Op. at 27. In this way, the Majority renders it unnecessary to review the City's practice with heightened scrutiny. I believe the Majority rewrites this court's binding precedent in Pugh v. Rainwater, 572 F.2d 1053 (5th Cir. 1978) (en banc),[2] which held that "[t]he incarceration of those who cannot [pay for pretrial release], without meaningful consideration of other possible alternatives, infringes on both due process and equal protection requirements." Id. at 1057. The Majority fails to recognize this infringement on the rights of indigents, so I dissent.

---

[1] I join the Majority in rejecting the City's arguments that Younger abstention applied; that the City wasn't liable for the bail policy under 42 U.S.C. § 1983; and that the Eighth Amendment, not the Fourteenth Amendment, applied to this case. See Maj. Op. Parts II.A, II.B, and III.A.2. I also agree that Mr. Walker's suit against the City's original bail policy is not moot and the District Court may enjoin the City from reinstating that policy. See id. Part V.A.3. Last, I join the Majority's grant of Mr. Walker's motions to supplement the record and dismiss the appeal in part. See id. at 15 n.4, 53 n.15.

[2] In Bonner v. City of Prichard, 661 F.2d 1206 (11th Cir. 1981) (en banc), we adopted as binding precedent all decisions of the former Fifth Circuit handed down before October 1, 1981. Id. at 1209.

## I.

The Supreme Court has repeatedly recognized that wealth-based detention is not permitted by our Constitution.  See Williams v. Illinois, 399 U.S. 235, 240–41, 90 S. Ct. 2018, 2022 (1970) (holding that Illinois's practice of extending a prisoner's sentence beyond maximum authorized by statute of conviction because of a prisoner's "involuntary nonpayment of a fine or court costs" is "an impermissible discrimination that rests on ability to pay"); Tate v. Short, 401 U.S. 395, 397–98, 91 S. Ct. 668, 670–71 (1971) (extending Williams to prohibit "jailing an indigent for failing to make immediate payment of any fine"); Bearden v. Georgia, 461 U.S. 660, 672–73, 103 S. Ct. 2064, 2073 (1983) (extending Williams and Tate to hold that a state court can't revoke probationary sentence for inability to pay fine or restitution without considering "alternate measures of punishment other than imprisonment").  The Bearden line of cases involved criminal penalties imposed after a conviction.  In Rainwater, the former Fifth Circuit extended these cases' "principle that imprisonment solely because of indigent status is invidious discrimination and not constitutionally permissible" to "[t]he punitive and heavily burdensome nature of pretrial confinement."  572 F.2d at 1056.

The Majority is right when it says Mr. Walker's claim "fits squarely" within the Bearden-like cases that raise both due process and equal protection concerns.

Maj. Op. at 20. But I part ways with the Majority, because I read these cases to support the District Court's application of heightened scrutiny under the Equal Protection Clause to the City's bail policy. See id. at 28.

The Majority relies on San Antonio Independent School District v. Rodriguez, 411 U.S. 1, 93 S. Ct. 1278 (1973), in deciding that Mr. Walker cannot make out an equal protection claim warranting heightened scrutiny. But I read Rodriguez to say he can. Rodriguez established the test for whether a wealth-based detention claim is subject to heightened scrutiny under an equal protection framework. The Rodriguez test first asks whether the challenged scheme uses indigency as a classification, examining whether it treats differently a "class [] composed only of persons who were totally unable to pay." Id. at 20, 22, 93 S. Ct. at 1290. The second question is whether the class has suffered an "absolute deprivation" of a benefit. See id. 20, 93 S. Ct. at 1290.

The Majority never addresses whether the Standing Bail Order discriminates against indigents. See Maj. Op. at 27. I say the Bail Order clearly uses indigency as a classification, and offer this simple example in support. Consider two people, one who has money and the other who does not. They are arrested for the same crime at the same time under the same circumstances. Under the Standing Bail Order, these two would have the identical bail amount, as

56

established by the master bail schedule.  The person who has money pays it and walks away.  The indigent can't pay, so he goes to jail.  This is plainly "imprisonment solely because of indigent status."  Rainwater, 572 F.2d at 1056; accord ODonnell v. Harris Cty., 892 F.3d 147, 162–63 & n.6 (5th Cir. 2018).

The Majority Opinion says this hypothetical shows I would require the government to be involved in all sorts of wealth-based interactions—including intervening to make pricier express mail options available to all postal patrons. See Maj. Op. at 30–34.  Not so.  Instead I look to the Supreme Court, which has expressly established limiting principles for equal protection claims by indigents. M.L.B. v S.L.J., 519 U.S. 102, 123–24, 117 S.Ct. 555, 567 (1996).  In M.L.B., the Court plainly said "[s]tates are not forced by the Constitution to adjust all tolls to account for disparity in material circumstances."  Id. (quotation omitted).  It explained that lawsuits seeking "state aid to subsidize [] privately initiated action or to alleviate the consequences of differences in economic circumstances that existed apart from state action" are different from those vindicating a person's right to participate in political processes or to have access to the courts in criminal cases.  Id. at 123–25, 117 S. Ct. at 568.

As to Rodriguez's second question, the Majority relies on the fact that the Standing Bail Order caps an indigent arrestee's pretrial detention at 48 hours to

conclude that the detention isn't an "absolute deprivation."[3]  In fact, the Majority

refers to this person's time in jail as just a "diminishment of a benefit."  Maj. Op.

at 25–27.  But this is word play.  First, the Majority renames the interest in

"freedom from incarceration" at issue here, as an interest in "access to pretrial

release."  But see ODonnell, 892 F.3d at 162 (identifying the interest as "freedom

from incarceration").  Second, the Majority's characterization treats 48 hours in jail

as a mere delay or "diminishment" of the benefit of being released, instead of the

deprivation of liberty it surely is.[4]

　　In my view, an incarcerated person suffers a complete deprivation of liberty

within the meaning of Rodriguez, whether their jail time lasts two days or two

years.  Certainly the Rodriguez Court had no problem concluding there was an

---

[3] The requirement to have a bond hearing within 48 hours is properly considered in determining whether the Standing Bail Order survives scrutiny.  However, the Majority relies on the 48-hour time period in deciding whether there was a deprivation in the first place.  This approach locks in the Majority's ultimate holding—that a bail system in which indigents get a hearing within 48 hours survives all systemic due process challenges.  Maj. Op. at 37–39.

[4] The Majority contends I do not "grapple meaningfully with Rainwater's explicit approval of bail schedules."  Maj. Op. at 24 n.9.  But Rainwater did not approve of bail schedules being used in the way Calhoun's Standing Bail Order works.  Rainwater said, "Utilization of a master bond schedule provides speedy and convenient release for those who have no difficulty in meeting its requirements.  The incarceration of those who cannot, without meaningful consideration of other possible alternatives, infringes on both due process and equal protection requirements."  572 F.2d at 1057.  The Majority Opinion emphasizes the first sentence but is blind to what the second sentence plainly says.  Calhoun's Standing Bail Order jails those who cannot pay bail for up to two days before it provides any alternative.  The Majority does not appear to believe these two days of incarceration qualify as incarceration, as that term was used by the Court in Rainwater.

58

"absolute deprivation" of liberty in Williams and Tate because the challenged state laws "subjected indigents to incarceration simply because of their inability to pay a fine." Rodriguez, 411 U.S. at 20–22, 93 S. Ct. at 1290. Rainwater also described pretrial confinement as a "deprivation of liberty." 572 F.2d at 1056. Neither Rodriguez nor Rainwater qualified how long the confinement had to last before it became a deprivation of liberty. See Rodriguez, 411 U.S. at 20–22, 93 S. Ct. at 1290; Rainwater, 572 F.2d at 1056. More recently, the Supreme Court reaffirmed that "[a]ny amount of actual jail time is significant and has exceptionally severe consequences for the incarcerated individual and for society which bears the direct and indirect costs of incarceration." Rosales-Mireles v. United States, 585 U.S. ___, 138 S. Ct. 1897, 1907 (2018) (citation and quotation omitted). And since Rainwater eliminated any distinction between a post-conviction and pre-conviction detention, the precedent that binds us tells us that two days in jail is a deprivation of liberty, whether it happens before or after a person has been convicted. See ODonnell, 892 F.3d at 162 n.6 ("[T]his court in Rainwater concluded that the distinction between post-conviction detention targeting indigents and pretrial detention targeting indigents is one without a difference.").

   I am not alone in this view. In addressing a challenge to the bail policies of Harris County, Texas, the Fifth Circuit looked to Rodriguez in holding that

"indigent misdemeanor arrestees are unable to pay secured bail, and, as a result, sustain an absolute deprivation of their most basic liberty interests—freedom from incarceration." ODonnell, 892 F.3d at 162. The Fifth Circuit thus held that "[h]eightened scrutiny of the County's [bail] policy is appropriate."[5] Id. The Majority Opinion says this case is "factually distinct" from ODonnell. For support, it looks to the District Court's findings about Harris County's written bail policies as they existed before the injunction was issued. See Maj. Op. at 27 n.10. Texas law required individualized assessments in determining bail. ODonnell, 892 F.3d at 153. But the Texas District Judge found Harris County failed to live up to this law because: "County officials impose[d] the scheduled bail amounts on a secured basis about 90 percent of the time," and its officers "were aware that, by imposing a secured bail on indigent arrestees, they were ensuring that those arrestees would remain detained." See id. at 153–54. In Calhoun, Georgia, the Standing Bail Order sets a secured bail amount for all arrestees, with no

---

[5] ODonnell interpreted Rainwater as I do—that is, extending Williams and Tate to the pretrial context and holding that pretrial detention of indigents solely because of their indigency is a deprivation of liberty and is subject to heightened scrutiny. ODonnell, 892 F.3d at 162 & n.6. The Majority's contrary interpretation of Rainwater, Maj. Op. at 24–25, thus draws this Court into a circuit split with the Fifth Circuit, based on interpretation of a case that is binding precedent for both courts. Although our Court is not bound to follow the decisions of the Fifth Circuit, we have observed that its interpretation of former Fifth Circuit precedent is entitled to "great weight." See AmBrit, Inc. v. Kraft, Inc., 812 F.2d 1531, 1535 n.13 (11th Cir. 1986) (noting that a post-split Fifth Circuit decision was "entitled to great weight because it [was] based on cases of the former Fifth Circuit that are binding precedent in this circuit").

individualized assessment.  And by creating a requirement for a determination of indigency within 48 hours, it implicitly acknowledges that people who are unable to pay for release will be detained under this system.  Thus, the only difference between Harris County's system, as described by the Texas District Judge, and Calhoun's system, is that the Texas system allowed indigents to be detained for longer than 48 hours.  See id. at 154 (noting arrestees "must wait days for their hearings").  Under our precedent, I do not view this factual difference as meaningful.

It seems unremarkable to say that being jailed for 48 hours is more than a mere inconvenience.  There are very real consequences for detained indigents.  They can lose their jobs.  They can lose their homes and transportation.  Their family connections can be disrupted.  And all this is to say nothing of the emotional and psychological toll a prison stay can have on an indigent person and her family members.  See Nick Pinto, The Bail Trap, N.Y. Times Mag. (Aug. 13, 2015), https://www.nytimes.com/2015/08/16/magazine/the-bail-trap.html ("'Most of our clients are people who have crawled their way up from poverty or are in the throes of poverty,' [Scott] Hechinger says.  'Our clients work in service-level positions where if you're gone for a day, you lose your job.  People in need of caretaking—the elderly, the young—are left without caretakers.  People who live

61

in shelters, where if they miss their curfews, they lose their housing.  Folks with immigration concerns are quicker to be put on the immigration radar.  So when our clients have bail set, they suffer on the inside, they worry about what's happening on the outside, and when they get out, they come back to a world that's more difficult than the already difficult situation that they were in before.'"); see also Gerstein v. Pugh, 420 U.S. 103, 114, 95 S. Ct. 854, 863 (1975) ("Pretrial confinement may imperil the suspect's job, interrupt his source of income, and impair his family relationships.").  And these consequences can be just as dire for a two-day jail stay as for a longer one.  See Juleyka Lantigua-Williams, Why Poor, Low-Level Offenders Often Plead to Worse Crimes, The Atlantic (July 24, 2016), https://www.theatlantic.com/politics/archive/2016/07/why-pretrial-jail-can-mean-pleading-to-worse-crimes/491975/ ("[S]ome of the most damaging effects of pretrial detention can happen really quickly within the first few days or a week.  If you lose your job, if you lose your apartment, if you need to find somebody else to take care of your kids, at that point the cost of future incarceration might not be so high . . . [so] [i]t reduces incentive to fight against a plea deal that involves another six months of jail." (interview with Megan Stevenson)); Samuel R. Wiseman, Pretrial Detention and the Right to be Monitored, 123 Yale L.J. 1344, 1356–57 (2014).

I am puzzled by the Majority's conclusion that detained indigents are somehow better off than their free and wealthy counterparts. Maj. Op. at 27. It is true that a person with money will be out-of-pocket whatever funds they paid as bond. But these wealthier bond payers have a choice: they can pay the bond or not. The poor have no choice. I simply reject the idea that people who have the ability to pay bond decide to keep it and go to jail to gain some sort of financial advantage.

Neither do I view the Bearden Court's single quotation from Justice Harlan's concurrence in Williams sufficient to support the Majority's embrace of the due process framework approved of in Mathews v. Eldridge, 424 U.S. 319, 96 S. Ct. 893 (1976). See Maj. Op. at 34–36. First, Bearden began with a reminder that the Supreme Court had "long been sensitive to the treatment of indigents in our criminal justice system." 461 U.S. at 664, 103 S. Ct. at 2068. And the Bearden Court ultimately reversed rulings of Georgia courts that had resulted in the jailing of a probationer who failed to pay his court ordered fines. Id. at 674, 103 S. Ct. at 2074.

Second, while the Court did reference Justice Harlan's view that a "due process approach more accurately captures the competing concerns" in this type of analysis, it made clear that cases implicating both due process and equal protection

63

concerns "cannot be resolved by resort to easy slogans or pigeonhole analysis" and require a context-specific inquiry. See id. at 666–67, 103 S. Ct. at 2069. If it appears the Bearden Court focused on due process principles as opposed to equal protection, that's because the particular case before it—challenging the State's failure to consider an indigent probationer's reasons for nonpayment of fines and restitution at a probation revocation hearing—rested more naturally on due process concerns than equal protection. Id. at 666 n.8, 103 S. Ct. at 2069 n.8. The Court reasoned that, "in setting or resetting a sentence," "a defendant's level of financial resources is a point on a spectrum," making indigency "a relative term rather than a classification" in that context. Id. However, the Court also explained that "whether the State has invidiously denied one class of defendants a substantial benefit available to another class of defendants [is analyzed] under the Equal Protection Clause." Id. at 665, 103 S. Ct. at 2069. Under Calhoun's Standing Bail Order, bail is established by a predetermined schedule without consideration of the arrestee's financial resources. Thus, Calhoun does not treat indigency as a "relative term." Instead, as set out above, only indigents are detained under the Bail Order, because people with money simply pay the preset amount and go home. This means, like with the statute in Williams, the Standing Bail Order "in operative effect exposes only indigents to the risk of imprisonment" and "visit[s]

64

different consequences on two categories of persons." Williams, 399 U.S. at 242, 90 S. Ct. at 2023.  This case, therefore, like "[m]ost decisions in this area," is properly analyzed under the equal protection framework.  See Bearden, 461 U.S. at 665, 103 S. Ct. at 2068–69.

In light of Supreme Court precedent, our sister circuit's agreement that Rainwater requires application of heightened scrutiny under the Equal Protection Clause to claims like Mr. Walker's, and the significant consequences stemming from incarceration, the Justice Harlan quote is simply not enough to support the Majority's due-process-only approach.[6]

I also reject the Majority's concern that a flood of litigation will result from treating wealth "like race, sex, or religion" as a reason not to apply heightened scrutiny.  Maj. Op. at 27–28.  First, there will be no flood.  The Supreme Court has already placed limits on bringing equal protection challenges to wealth-based classifications.  Beyond the requirements set out in Rodriguez discussed above, the

---

[6] However, I do not read the Majority Opinion to reject heightened scrutiny for all cases challenging indigency-based jail stays.  The outcome of the Majority decision relies entirely on the idea that 48 hours in jail is not an "absolute deprivation" of liberty.  See Maj. Op. at 27.  The Majority Opinion also explains that it believes ODonnell to be a different case from this one, because Harris County's practices resulted in longer jail stays despite already-in-place requirements for individualized assessments in determining bail.  See Maj. Op. at 27 n.10 & 39 n.12.  Thus, even under the Majority's view, challenges to indigency-based jail stays warrant heightened scrutiny so long as they show that the challenged system, in practice, results in indigents being detained longer than 48 hours.  Thus, if Calhoun cannot live up to the procedural safeguards it promises in the Standing Bail Order and detains indigents longer than 48 hours, Mr. Walker will be able to revive his equal protection challenge under a heightened scrutiny review.

65

Supreme Court has also said that "fee requirements ordinarily are examined only for rationality," except when they implicate the "basic right to participate in political processes as voters and candidates" and "access to judicial processes in cases criminal or quasi criminal in nature." M.L.B., 519 U.S. at 123–24, 117 S. Ct. at 567 (quotation omitted).[7] Thus, Mr. Walker's claim falls into quite a narrow exception, and recognizing it as such does not portend striking down tuition fees or express service at the local post office. This Court and the Fifth Circuit have survived over the forty years since Rainwater was decided without being flooded with litigation raising wealth-based discrimination claims. And we are only called upon here to make explicit what was already implicit in Rainwater—namely that pretrial detention based solely on indigency is subject to heightened scrutiny. Second, even if our workload increased a bit, "the constitutional imperatives of the Equal Protection Clause must have priority over the comfortable convenience of

---

[7] The Majority asks how Mr. Walker's claim fits into M.L.B.'s narrow exception for cases concerning access to judicial processes. Maj. Op. at 32–33. Again, M.L.B. explicitly answers this question. The Court explained that its "decisions concerning access to judicial processes," including Bearden and its progeny, "reflect both equal protection and due process concerns." M.L.B., 519 U.S. at 120, 117 S. Ct. at 566. "The equal protection concern relates to the legitimacy of fencing out [individuals] based solely on their inability to pay core costs." Id. Or said yet another way, "'[e]qual protection' emphasizes disparity in treatment by a State between classes of individuals whose situations are arguably indistinguishable." Ross v. Moffitt, 417 U.S. 600, 609, 94 S. Ct. 2437, 2443 (1974). I have already explained how the Standing Bail Order discriminates against indigents, and the Majority has not disputed that. Thus, this case plainly falls into the category of cases concerning access to judicial processes. See M.L.B., 519 U.S. at 120, 117 S. Ct. at 566.

66

the status quo." Williams, 399 U.S. at 245, 90 S. Ct. at 2024. I believe the courts are up to the task.

In sum, I read Rodriguez (and Bearden for that matter) to require that Mr. Walker's claim of wealth-based discrimination be subject to heightened scrutiny under a traditional equal protection framework. Thus, I would have affirmed the District Court's analysis.[8]

## II.

In applying heightened scrutiny to Mr. Walker's claim, I recognize that the Supreme Court has not made clear whether the level of scrutiny to be applied in Bearden-like cases is intermediate or strict scrutiny. See, e.g., M.L.B., 519 U.S. at 120–21, 123–24, 117 S. Ct. at 566, 567–68 (acknowledging that "[a] precise rationale has not been composed" and rejecting review "for rationality" in criminal or quasi criminal cases "concerning access to judicial processes"). Rainwater is similarly unclear, though its discussion of "vital" and "compelling" interests and the need to "delicate[ly] balance[e]" them, seems to me to point toward strict

---

[8] Mr. Walker alternatively challenged the Standing Bail Order under a substantive due process theory, arguing there is a fundamental right to pretrial liberty. See United States v. Salerno, 481 U.S. 739, 749–50, 107 S. Ct. 2095, 2102–03 (1987) (affirming the individual's "strong interest in liberty," the State's "sufficiently weighty" interest in preventing crime, and the "'general rule' of substantive due process that the government may not detain a person prior to a judgment of guilt in a criminal trial" absent "special circumstances"). Because I would affirm the District Court's application of heightened scrutiny under the traditional equal protection analysis, I do not address the substantive due process theory.

scrutiny.  See Rainwater, 572 F.2d at 1056.  Nevertheless, it is my view that on this record, the City's Standing Bail Order cannot survive even under intermediate scrutiny.  The City failed to show that a 48-hour detention of only those who cannot afford to pay bond is "reasonably necessary to the accomplishment of legitimate state objectives."  See Bullock v. Carter, 405 U.S. 134, 144, 92 S. Ct. 849, 856 (1972).[9]

The City of Calhoun says it has the same interest that was identified in Rainwater.  That is the "compelling interest in assuring the presence at trial of persons charged with crime."  Rainwater, 572 F.2d at 1056.  But the City never explains why or how a 48-hour detention period is "reasonably necessary" to accomplish this interest.  After the 48 hours, everyone who was arrested, but could

---

[9] Over the years, the Supreme Court has given us many formulations of "intermediate scrutiny."  For example, "[a] gender classification fails unless it is substantially related to a sufficiently important governmental interest."  City of Cleburne v. Cleburne Living Ctr., 473 U.S. 432, 441, 105 S. Ct. 3249, 3255 (1985).  But classifications based on a person's legitimacy, which is of course beyond that person's control, "will survive equal protection scrutiny to the extent they are substantially related to a legitimate state interest."  Id. (quotation omitted).  In Bullock, the Supreme Court subjected Texas's filing-fee requirement for primary candidates to get on a ballot to "close[] scrutin[y]" and invalidated it as a "denial of equal protection of the laws."  Bullock, 405 U.S. at 144, 149, 92 S. Ct. at 856, 859.  In applying heightened scrutiny to this wealth-based discrimination, the Court sought to determine whether the "filing-fee scheme" was "reasonably necessary to the accomplishment of legitimate state objectives."  Id. at 144, 92 S. Ct. at 856; see also Rodriguez, 411 U.S. at 22, 93 S. Ct. at 1290–91 (including Bullock in a list of cases in which the Court invalidated impermissible wealth-based classifications on equal protection grounds).  Because M.L.B. also cited to Bullock in discussing the other exception to the rule that "fee requirements are ordinarily examined for rationality," M.L.B., 519 U.S. at 124 n.14, 117 S. Ct. at 568 n.14, this seems to me to be the most analogous case explicitly setting out the kind of tailoring required between the competing interests.  Thus, I use its standard.

68

not make bond, is released on personal recognizance bonds (their promises to appear), whether they get a hearing or not.  The obvious question comes to mind: if every indigent's promise to appear is enough to assure his presence at trial after 48 hours passes, why is 48 hours necessary to determine indigency and execute a personal recognizance bond?  Wouldn't 47 work just as well?  Forty, perhaps?

The City makes no effort to justify its policy of detaining those who cannot pay for 48 hours, because it says it doesn't need to.  It argues only that capping detentions at 48 hours is "sufficient to immunize the City from a challenge to its process for a determination of indigency."  In making this argument, the City relies on two cases: Gerstein, 420 U.S. 103, 95 S. Ct. 854, and its sequel, County of Riverside v. McLaughlin, 500 U.S. 44, 111 S. Ct. 1661 (1991).  In Gerstein, the Supreme Court held that "the Fourth Amendment requires a timely judicial determination of probable cause as a prerequisite to [pretrial] detention."  420 U.S. at 126, 95 S. Ct. at 869.  The opinion defined "timely" as "before or promptly after arrest."  Id. at 125, 95 S. Ct. at 869.  Later, in McLaughlin, the Court said "Gerstein struck a balance between competing interests" by requiring a "prompt— not immediate" probable cause determination.  McLaughlin, 500 U.S. at 54–55, 111 S. Ct. at 1669. Acknowledging the "everyday problems of processing suspects through an overly burdened criminal justice system," the Supreme Court said that

69

"judicial determinations of probable cause within 48 hours of arrest will, as a general matter, comply with the promptness requirement." Id. at 55–56, 111 S. Ct. at 1669–70.

According to the City, "this case is to Rainwater what McLaughlin was to Gerstein." But there are two problems with this argument. First, McLaughlin said hearings "delayed unreasonably" can still violate Gerstein, for example, when the "delay [is] for delay's sake." McLaughlin, 500 U.S. at 56, 111 S. Ct. at 1670. Here, the City has given no reason to justify the 48-hour detention period under the Standing Bail Order (not even an argument citing "everyday problems of processing suspects," see id. at 55, 111 S. Ct. at 1669). As best I can tell, the City is thus asking for 48 hours of "delay for delay's sake," which is precisely what McLaughlin forbade.

Second, McLaughlin decided when a probable cause hearing is required by the Fourth Amendment. 500 U.S. at 47, 111 S. Ct. at 1665. Again, this case involves both equal protection and due process concerns. And while a hearing within 48 hours could satisfy the due process concerns, it does not necessarily satisfy the demands of equal protection. For example, consider a bail policy that releases all arrestees after booking, except for female, black, or Catholic arrestees. Those arrestees are detained for 48 hours, given a hearing, and then released.

70

Under the City's theory, McLaughlin immunizes this policy from any challenge merely because, after all, the female, black, and Catholic arrestees get a hearing within 48 hours. This is plainly wrong. Equal protection principles require us to inquire of the City why it needs to treat female, black, and Catholic arrestees differently from all others and then to examine whether the given reason is sufficiently tailored to accomplish the City's legitimate or compelling objective. So the same goes for wealth-based classifications in the criminal justice system. The City should have been required to explain why it is "reasonably necessary" to treat poor people differently from all others by keeping them in jail for 48 hours. Since Calhoun offered no reason during this appeal, let alone a "legitimate" one, the Standing Bail Order cannot survive constitutional scrutiny. See Bullock, 405 U.S. at 144, 92 S. Ct. at 856.[10]

Finally, my view of McLaughlin and the interests at stake is not contrary to ODonnell. While the Fifth Circuit relied in part on McLaughlin to hold that "the federal due process right entitles detainees to a hearing within 48 hours," it did not

---

[10] At oral argument, the City did offer one justification for its 48-hour detention policy: "to get the players to the game"—meaning to get the City's only municipal judge to the municipal court so she can hold a hearing. Nevertheless, this Court's longstanding rule is that arguments not briefed to the court and raised for the first time at oral argument are deemed abandoned. See Mesa Air Grp., Inc. v. Delta Air Lines, Inc., 573 F.3d 1124, 1130–31 (11th Cir. 2009) (refusing to consider the merits of an argument made only at oral argument but not in briefs). This rule seems especially appropriate here, in light of the City's position in its briefs that it did not need to justify its policy.

71

grant immunity from systemic challenges to Harris County like the immunity sought by Calhoun here. See ODonnell, 892 F.3d at 160. Instead, the Fifth Circuit determined that, in light of the evidentiary record, the District Court's injunction mandating a bail hearing within 24 hours was "too strict" and so extended the time for the hearing to 48 hours. Id. at 160–61 (noting the "heavy administrative burden" on the County as shown by the finding that "20% of detainees do not receive a probable cause hearing within 24 hours despite [a] statutory requirement"). Because Calhoun here offered no justification for its 48-hour period, I would have affirmed the preliminary injunction entered by Judge Murphy in the District Court, as well the 24-hour release requirement he imposed. On remand, the City would have had the opportunity to develop an evidentiary record and make the showing necessary to survive heightened scrutiny.

It seems worthy of mention that the Fifth Circuit's modified injunction in ODonnell is remarkably similar to what the District Court ordered in this case. The modified injunction required, within 24 hours, a determination of indigency based on affidavits, for those who could not pay the prescheduled bail amounts in a process overseen by "Pretrial Services officers"; release based on an "unsecured personal bond with nonfinancial conditions of release" or "on a secured money bond for which the defendant could pay a commercial surety's premium"; and for

72

those who are not so released, "a hearing within 48 hours of arrest." Id. at 164–65. This system provided "meaningful consideration of other possible alternatives" concurrently with the utilization of a master bail schedule, as opposed to 48 hours later, and the County justified its need for 48 hours as opposed to 24. For that reason, I believe the Fifth Circuit's modified injunction appropriately addresses both the equal protection and due process concerns. See Rainwater, 572 F.2d at 1055–56 & n.2, 1058 (mooting a challenge to Florida Supreme Court's new rule, which subjected indigent and non-indigent arrestees alike to a first appearance hearing where a judge would select from six different kinds of release, including personal recognizance bonds, unsecured bonds, and secured bonds, because the rule did not "suffer such infirmity that its constitutional application is precluded"); see also Bearden, 461 U.S. at 672, 103 S. Ct. at 2073 (requiring courts to consider a probationer's reasons for failures to pay a fine or restitution and, for those without means to pay, consider "alternate measures of punishment other than imprisonment" before imposing jail time). Nevertheless, the Majority has established that in this Circuit, only due process interests are at stake; only a hearing is necessary; and the hearing must be held within 48 hours.

III.

I believe Mr. Walker has shown a substantial likelihood of success on the merits. See Palmer v. Braun, 287 F.3d 1325, 1329 (11th Cir. 2002). I also believe Mr. Walker can show the other three requirements for getting a preliminary injunction: Jail time is an "irreparable injury" because "it cannot be undone through monetary remedies." See Cunningham v. Adams, 808 F.2d 815, 821 (11th Cir. 1987). And because the City gave no justification for its policy of detaining indigents for 48 hours, the harm to the plaintiff class clearly outweighs any harm to the City. Last, in light of studies showing how bail policies like the City's contribute to systemic injustices in the criminal justice system and harm poor communities, see, e.g., Brief for Am. Bar Ass'n at 6–21 as Amicus Curiae Supporting Appellee, Walker v. City of Calhoun (No. 17-13139), the public interest clearly weighs in favor of the injunction. In my view, the District Court did not abuse its considerable discretion in granting Mr. Walker's motion for a preliminary injunction. See Palmer, 287 F.3d at 1329.

Finally, to the extent the City challenges the scope of the District Court's injunction, I would also find no abuse of discretion. See Swann v. Charlotte-Mecklenburg Bd. of Educ., 402 U.S. 1, 15, 91 S. Ct. 1267, 1276 (1971) ("Once a right and a violation have been shown, the scope of a district court's equitable

74

powers to remedy past wrongs is broad, for breadth and flexibility are inherent in equitable remedies.").

## CONCLUSION

I read Supreme Court precedent and <u>Rainwater</u> to require a traditional equal protection analysis of the City of Calhoun's Standing Bail Order, applying heightened scrutiny review. On the record before us, I would have upheld the District Court's grant of a preliminary injunction to Mr. Walker. I recognize that the City has not yet had a chance to develop an evidentiary record about its need for a 48-hour detention policy for indigents only. For that reason, I would have allowed the City an opportunity to develop that record on remand and seek a different result when this case is considered on the merits.