[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT
_____

No. 18-11060
_____

D.C. Docket No. 1:15-cv-00607-ELR

ZIAHONNA TEAGAN,

Plaintiff-Appellant,

versus

THE CITY OF MCDONOUGH, GEORGIA,

Defendant-Appellee.

_____

Appeal from the United States District Court
for the Northern District of Georgia

_____

(February 11, 2020)

Before JORDAN, TJOFLAT and ANDERSON, Circuit Judges.

PER CURIAM:

Ziahonna Teagan sued the City of McDonough, Georgia, for claims related to her misdemeanor proceedings in municipal court for failure to maintain automobile liability insurance as required by Georgia law.  She asserted federal claims under 42 U.S.C. § 1983 for violations of her Fourth, Sixth, and Fourteenth Amendment rights, and a state-law claim under Georgia law for false imprisonment.   The district court granted summary judgment in favor of the City, ruling that the actions of the municipal court could not be attributed to the City so as to impose § 1983 municipal liability under *Monell v. Department of Social Services*, 436 U.S. 658 (1978), and its progeny.

We affirm the district court's grant of summary judgment on Ms. Teagan's § 1983 claims.  The McDonough municipal court was exercising its judicial power under Georgia law to adjudicate a state-law offense—and not a violation of a city or county ordinance—and therefore was not acting on behalf of the City when it took the actions that Ms. Teagan complains of.

But we do not affirm the final judgment in favor of the City.  The district court did not address Ms. Teagan's separate state-law claim for false imprisonment, so we remand for further proceedings on that claim.

# I

This case is primarily about federal law, specifically the principles for imposing municipal liability under § 1983 pursuant to *Monell*.   Yet, as we have

explained a number of times, whether an individual or entity acts on behalf of a municipality or the state generally turns on an analysis of state law. *See, e.g., Owens v. Fulton Cty.*, 877 F.2d 947, 950 (11th Cir. 1989). So before we get to the facts, we set out a bit of background on municipal courts in Georgia to provide context for Ms. Teagan's claims.

Municipal courts in Georgia are generally creatures of local government. *See* Ga. Code Ann. § 36-32-1(a). But municipal courts also have jurisdiction to adjudicate state-law misdemeanor traffic offenses pursuant to Georgia Code § 40-13-21(a)-(b) if the defendant waives his or her right to a jury trial. *See Kolker v. State*, 391 S.E.2d 391, 393–94 (Ga. 1990) (holding that Article VI, § 1, ¶ 1 of the Georgia Constitution "authorizes the General Assembly to vest municipal courts with jurisdiction over state misdemeanor offenses"). As the Georgia Supreme Court has explained: "The [Georgia] General Assembly's exercise of its constitutional authority to enact legislation vesting municipal courts with jurisdiction over various state misdemeanor offenses . . . imbues the municipal court with limited state judicial power when it tries a defendant for violation of the state misdemeanors the General Assembly has placed within its jurisdiction." *Nguyen v. State*, 651 S.E.2d 681, 684 (Ga. 2007), *overruled on other grounds by Brown v. Crawford*, 715 S.E.2d 132 (Ga. 2011).

In Georgia, the failure to maintain automobile liability insurance constitutes a state-law misdemeanor. That offense is punishable by a fine of between $200 and $1,000 and/or a term of imprisonment of up to 12 months. *See* Ga. Code Ann. § 40-6-10(a)(4).

## A

On November 7, 2013, an officer cited Ms. Teagan for failure to maintain automobile liability insurance, which as noted is a misdemeanor under Georgia law. Approximately six weeks later, she appeared before a judge in the McDonough municipal court for arraignment.

Ms. Teagan was one of several defendants present in the courtroom for arraignment that day. The judge collectively read to the entire group a statement advising them of their constitutional rights, including the right to a jury trial, the right to counsel, and the right to request court-appointed counsel. The judge further advised that anyone who did not understand could request clarification. He did not, however, conduct an individual colloquy with Ms. Teagan regarding her rights. Nor did she waive those rights, orally or in writing, at the arraignment.

When her case was called, Ms. Teagan pleaded not guilty and orally advised the judge that she wanted a bench trial. She also requested a continuance of her trial, informing the court clerk that the continuance would allow her sufficient time to obtain an attorney.

On March 19, 2014, Ms. Teagan appeared at her bench trial before Donald Patten, the Chief Judge of the McDonough municipal court. She was not represented by counsel. Just before the trial commenced, the bailiff instructed her to initial and sign a form titled "Jury Trial Waiver." This form purported to waive her right to a jury trial as well as her right to counsel. Chief Judge Patten also signed the form, attesting that Ms. Teagan had knowingly and willingly waived her right to a jury trial. But he conducted no additional inquiry of Ms. Teagan regarding her understanding of the form or the voluntariness of her waivers.

Proceeding *pro se*, Ms. Teagan cross-examined the officer who issued the citation and who had testified for the state. She also testified on her own behalf, conceding that she had been driving without insurance. Chief Judge Patten found her guilty of driving without insurance and imposed a fine of $745, as well as a $50 penalty for being late to court.

Ms. Teagan informed Chief Judge Patten that she was unable to pay the fine that day, but that she would be able to do so by the following Friday—March 28, 2014. Chief Judge Patten then sentenced her to 60 days in jail, suspended on the condition that she pay the $795 fine by March 28.

**B**

On March 24, Ms. Teagan—again proceeding *pro se*—filed a "Motion for Stay Pending Appeal" with the municipal court, requesting the court to "grant a Stay

of [the] Court's Order dated March 14, 2014 pending appellate review[.]"  Chief Judge Patten reviewed the filing and determined that it was not in the proper form to serve as a valid motion for appeal, but took no action beyond instructing the deputy clerk to place it in Ms. Teagan's court file.  No one at the municipal court notified Ms. Teagan that her motion had effectively been denied.

When Ms. Teagan was unable to pay the $795 fine by March 28, the municipal court clerk prepared an application for an arrest warrant.  Chief Judge Patten then executed and issued the warrant at the same time, imposing an additional $100 "contempt charge."

Pursuant to the warrant, a deputy from the Henry County Sheriff's Office arrested Ms. Teagan at her home on May 18, 2014, in front of her family and neighbors.  She was taken directly to the Henry County Jail, where she was photographed, fingerprinted, and issued a jail uniform.

Under Georgia law, Ms. Teagan should have been taken before a municipal court judge "within 72 hours" of her arrest.  *See* Ga. Code Ann. § 17-4-26; Ga. Unif. Mun. Ct. R. 20.1 (Dec. 2011); *Tidwell v. Paxton*, 651 S.E.2d 714, 715 (Ga. 2007). Yet she stayed in jail for 10 days—housed in a two-person cell with other inmates,

including some awaiting trial on felony charges—until she was again brought before Chief Judge Patten on May 28, 2014.[1]

At her appearance on May 28, Chief Judge Patten explained to Ms. Teagan—who was again without counsel—that she had been incarcerated for her failure to pay her fine by the agreed-upon March 28 deadline, and that she was therefore subject to the previously suspended 60-day jail sentence. Chief Judge Patten did not inquire into why Ms. Teagan had failed to pay the fine or whether she had the ability to pay it. At the conclusion of the appearance, Chief Judge Patten ordered Ms. Teagan to be returned to the Henry County Jail to serve the remainder of her 60-day sentence.[2]

The following day, Ms. Teagan's brother wrote a check to the Henry County Sheriff for $895 to pay for Ms. Teagan's initial fine and the $100 "contempt charge." To be able to satisfy the fine, her brother drew from the government benefits of Ms. Teagan's daughter, his own government benefits, and their rent money. The Sheriff transferred the money to the City, and Ms. Teagan was released on May 30, 2014.

---

[1] The purpose of Ms. Teagan's May 28 appearance before Chief Judge Patten is unclear. At his deposition, Chief Judge Patten testified that he could not remember why Ms. Teagan was brought before the municipal court at that time. The appearance was well after the 72-hour time frame required by Georgia law, and Chief Judge Patten explained that it was not his normal procedure to order someone into court from the jail, unless it was specifically requested or warranted under other special circumstances.

[2] Ms. Teagan explained at her deposition that, at the time of the trial, she had intended to secure a loan to pay the fine by the March 28 deadline. She had stopped working in February, however, and learned only after the trial that she would be unable to secure a loan without proof of employment. She therefore filed a motion to stay pending appeal.

**C**

In early 2015, Ms. Teagan sued the City of McDonough in federal court.  In her operative complaint, she asserted federal claims under § 1983 for violations of her Fourth, Sixth, and Fourteenth Amendment rights, and a state-law claim for false imprisonment.  Specifically, she alleged that the McDonough municipal court (1) violated her Due Process and Equal Protection rights by imprisoning her without determining the willfulness of her failure to pay or her ability to pay; (2) ran afoul of the Sixth Amendment by failing to secure a proper, individual waiver of counsel from her and by failing to appoint counsel; (3) violated the Fourth Amendment by executing and issuing an invalid arrest warrant unsupported by probable cause; (4) failed to conduct a preliminary revocation hearing to determine whether she had failed to comply with a condition of her suspended sentence; (5) failed to bring her before a judicial officer within 72 hours of her arrest and incarceration, as required by Georgia law; and (6) falsely imprisoned her in violation of Georgia Code § 51-7-20.

Both parties moved for summary judgment, which the district court granted in favor of the City.  The district court ruled that all of the actions alleged in Ms. Teagan's complaint were taken by the McDonough municipal court pursuant to its authority to act with "limited state judicial power" to enforce state misdemeanor laws under Georgia Code § 36-32-1(a) (granting municipal courts "jurisdiction over

8

the violation of municipal ordinances and over such other matters as are by general law made subject to the jurisdiction of municipal courts"). The district court relied on the Georgia Supreme Court's decision in *Nguyen,* 651 S.E.2d at 684, which explained that the  General Assembly, as permitted by the Georgia Constitution, has given municipal courts "limited state judicial power" to try a defendant for the violation of certain state misdemeanor offenses. Because the municipal court was not acting on behalf of the City, the district court concluded that the City could not be held liable under § 1983 pursuant to *Monell* and its progeny. The district court, however, did not separately address Ms. Teagan's state-law false imprisonment claim.

## II

Our review of the district court's summary judgment order is plenary. *See, e.g., Jones v. Firestone Tire & Rubber Co.*, 977 F.2d 527, 535 (11th Cir. 1992). Summary judgment is appropriate if the record shows that there are no genuine issues of material fact and that the moving party is entitled to judgment as a matter of law. *See, e.g., Eberhardt v. Waters*, 901 F.2d 1578, 1580 (11th Cir. 1990). As the parties have raised no disputes over the material facts, this appeal concerns only questions of law.

**A**

"Municipal liability under § 1983 is incurred only where 'a deliberate choice to follow a course of action is made from among various alternatives by the official or officials responsible for establishing final policy with respect to the subject matter in question.'" *Owens*, 877 F.2d at 949–50 (citation omitted). To prove municipal liability under § 1983, a plaintiff "must show that the local government entity . . . has authority and responsibility over the governmental function at issue[.]" *Grech v. Clayton Cty.*, 335 F.3d 1326, 1330 (11th Cir. 2003) (en banc). With respect to Ms. Teagan's § 1983 claims against the City, therefore, the critical and threshold question is whether the McDonough municipal court, through Chief Judge Patten, was acting on behalf of the City when it took the actions which form the basis for the constitutional violations alleged by Ms. Teagan. If it was not, the City cannot be held liable under § 1983. *See McMillian v. Johnson*, 88 F.3d 1573, 1578 (11th Cir. 1996) ("A threshold question . . . is whether the official is going about the local government's business. If the official's actions do not fall within an area of the local government's business, then the official's actions are not acts of the local government."), *aff'd sub nom. McMillian v. Monroe Cty.*, 520 U.S. 781 (1997).

Whether an official or entity acts on behalf of a municipality or the state "in a particular area, or on a particular issue," is—labels aside—a federal question that is "dependent on an analysis of state law." *McMillian*, 520 U.S. at 786. *See also*

10

*Grech*, 335 F.3d at 1330.  Although we have not yet addressed this question with respect to municipal courts in Georgia, our decision in *Familias Unidas v. Briscoe*, 619 F.2d 391 (5th Cir. 1980), provides a critical starting point.

In *Familias Unidas*, a Texas county judge in Medina County, acting pursuant to the request of a local school district, ordered an organization of Mexican-American students and adults to disclose its members.  *See id.* at 396.  The judge did so pursuant to state law, specifically § 4.28 of the Texas Education Code.  *See id.* at 396–97.  The organization and one of its members then filed suit in federal court against the former Texas governor, the county court judge, and the superintendent and members of the board of trustees of the school district (all in their individual and official capacities).  *See id.* at 394–95, 397.  The plaintiffs sought a declaration that § 4.28 was unconstitutional, an injunction against its implementation, and damages for the members of the organization as a class.  *See id.* at 397.

We ultimately concluded that § 4.28 violated the First Amendment, and ruled that the individual plaintiff was entitled to an award of nominal damages not to exceed one dollar "based on the instant application of the unconstitutional statute and the resultant infringement of her First Amendment right of association."  *Id.* at 402.  We then turned to the question of "who shall be required to pay this award."  *Id.* at 403.

11

As relevant here, we surveyed Texas law and held that the county judge's compliance with the school district's request and issuance of the disclosure demand did not "represent[ ] the official policy" of the county. *Id.* at 404. Recognizing that a county judge could act in ways that might constitute county policy (e.g., the performance of certain administrative duties), we explained that "the narrow authority delegated to the county judge in [§] 4.28 . . . bears no relation to his traditional role in the administration of county government or the discretionary powers delegated to him by state statute in aid of that role." *Id.* "Instead," we continued, "his duty in implementing [§] 4.28, much like that of a county sheriff enforcing a state law, may more fairly be characterized as the effectuation of the policy of the State of Texas embodied in that statute, for which the citizens of a particular county should not bear singular responsibility. Accordingly, under the standards set forth in *Monell* we hold that Medina County is not susceptible to liability under [§] 1983 for [the county judge's] issuance of the disclosure demands." *Id.*

**B**

"The practical test articulated in *Familias Unidas* . . . is whether the decisionmaker, by virtue of his official conduct, serves as the 'final authority or ultimate repository of county power.'" *Owens*, 877 F.2d at 950 (quoting *Familias Unidas*, 619 F.3d at 404). The narrow question here is whether under Georgia law

12

the McDonough municipal court, through Chief Judge Patten, acted on behalf of the state or the City when adjudicating Ms. Teagan's state-law misdemeanor offense. As we explain, we conclude that Chief Judge Patten acted on behalf of the state because he was exercising his authority under state law to preside over a state misdemeanor offense.[3]

*Familias Unidas* generally teaches that a county or municipal court judge acts on behalf of the state, and not on behalf of the municipality, when he engages in judicial acts for the purpose of applying or enforcing a state law. *See Lucas v. O'Loughlin*, 831 F.2d 232, 235 (11th Cir. 1987) ("The Court [in *Familias Unidas*] found that the action of the state judge upon which the plaintiff sought to bind the county was an act of the judge mandated by a state statute, rather than one of the functions normal to the operation of a county judge. The plaintiff, therefore, lost on his contention that the county should be liable."). *Familias Unidas* was, of course,

---

[3] Because this case does not present the question, we leave for another day whether a municipal court judge acts on behalf of a municipality when he or she exercises judicial authority with respect to local ordinances enacted by the municipality. *Compare Walker v. City of Calhoun*, 901 F.3d 1245, 1256 (11th Cir. 2018) (concluding, at the preliminary injunction stage, that a Georgia municipal court acted on behalf of the city in setting bail policy, and therefore was not immune from § 1983 liability in an indigent arrestee's class action lawsuit challenging the court's standing bail order); *ODonnell v. Harris Cty.*, 892 F.3d 147, 155–56 (5th Cir. 2018) (holding that a county judge was a policymaker for the county in establishing an "unwritten, countywide process for setting bail that violated both state law and the Constitution"); *Anela v. City of Wildwood*, 790 F.2d 1063, 1066–67 (3d Cir. 1986) (holding that a municipal court judge's "cash bail schedule," which failed to comply with a state supreme court rule, constituted a municipal practice for which the city could be held liable under *Monell*).

based on an examination of Texas law, so it is not controlling. But an analysis of Georgia law leads to the same result as in *Familias Unidas*.[4]

Ms. Teagan correctly points out that municipal courts in Georgia are generally creatures of local government—Georgia law, after all, gives municipalities the power to create municipal courts, appoint judges to those courts, and fix their compensation. *See, e.g.,* Ga. Code Ann. §§ 36-32-1(a) & 36-32-2(a). And the judges of the McDonough municipal court may be removed from office by the mayor and city council. *See* McDonough City Charter, Art. IV, § 4-11(d). But the question here is not whether municipal courts in Georgia should be *generally* viewed as state or municipal actors. It is, instead, is a more narrow one: whether municipal courts in Georgia act on behalf of the state or on behalf of the municipality when they adjudicate misdemeanor offenses under state law. *See McMillian*, 520 U.S. at 785–86 ("Thus, we are not seeking to make a characterization of Alabama sheriffs that will hold true for every type of official action they engage in. We simply ask whether Sheriff Tate represents the State or the county when he acts in a law enforcement capacity.").

---

[4] We note—without passing on or endorsing their rationales—that a number of circuits have come to the same conclusion with respect to municipal or local courts adjudicating state-law offenses. *See, e.g., Eggar v. City of Livingston*, 40 F.3d 312, 314–15 (9th Cir. 1994) (Montana); *Johnson v. Moore*, 958 F.2d 92, 93–94 (5th Cir. 1992) (Mississippi).

Although the Georgia Supreme Court has sometimes characterized municipal courts as municipal bodies "discharging strictly municipal functions," *Ward v. City of Cairo*, 583 S.E. 2d 821, 823 (Ga. 2003), such a definitive across-the-board classification is not accurate. As noted earlier, municipal courts in Georgia have jurisdiction to adjudicate state-law misdemeanor traffic offenses pursuant to Georgia Code § 40-13-21(a)-(b). *See Kolker*, 391 S.E.2d at 393 (holding that Article VI, § 1, ¶ 1 of the Georgia Constitution "authorizes the General Assembly to vest municipal courts with jurisdiction over state misdemeanor offenses"). *See also* Ga. Code Ann. § 36-32-3 ("All judges of all municipal courts in this state shall have and are given the same powers and authorities as magistrates in the matter of and pertaining to criminal cases of whatever nature in the several courts of this state."). The Georgia Supreme Court has explained that the "General Assembly's exercise of its constitutional authority to enact legislation vesting municipal courts with jurisdiction over various state misdemeanor offenses . . . imbues the municipal court with *limited state judicial power* when it tries a defendant for violations of the state misdemeanors the General Assembly has placed within its jurisdiction." *Nguyen*, 651 S.E.2d at 684 (emphasis added).

Ms. Teagan was charged with driving without insurance, which constitutes a state-law misdemeanor offense. *See* Ga. Code Ann. § 40-6-10(a). Under Georgia law and the rationale of *Familias Unidas*, Chief Judge Patten was acting on behalf

15

of the state when he presided over her case, found her guilty, sentenced her, signed a warrant for her arrest, issued a $100 "contempt charge" for her failure to pay the fine, and ordered her to serve the 60-day sentence that had been suspended. *See Familias Unidas*, 619 F.2d at 404. And because a conviction in a Georgia municipal court for a state-law misdemeanor traffic offense is appealable to the superior court, *see* Ga. Code Ann. § 40-13-28, we cannot say that under Georgia law the City had "control over" Chief Judge Patten or the McDonough municipal court with respect to the adjudication of Ms. Teagan's state-law misdemeanor traffic offense. *See McMillian*, 520 U.S. at 785 ("Our cases on the liability of local governments under § 1983 instruct us to ask whether governmental officials are final policymakers for the local government in a particular area, or a particular issue."); *Grech*, 335 F.3d at 1332 ("[T]he appropriate § 1983 inquiry under federal law is whether . . . Clayton County, under Georgia law, has control over the Sheriff in his law enforcement function, particularly for the entry and validation of warrants . . . and the training and supervision of his employees in that regard."). We therefore affirm the district court's grant of summary judgment to the City on Ms. Teagan's § 1983 claims.

## C

In his concurrence, Judge Tjoflat concludes that Ms. Teagan's § 1983 claims are barred by *Heck v. Humphrey*, 512 U.S. 477 (1994). Having already affirmed the

16

grant of summary judgment in favor of the City on the § 1983 claims, we need not address the applicability of *Heck*.

First, the Supreme Court's own language suggests that *Heck* deprives the plaintiff of a cause of action—not that it deprives a court of jurisdiction. *See id.* at 489 ("We do not engraft an exhaustion requirement upon § 1983, but rather deny the existence of a cause of action. . . . Just as a cause of action for malicious prosecution does not accrue until the criminal proceedings have terminated in the plaintiff's favor . . . so also a § 1983 cause of action for damages attributable to an unconstitutional conviction or sentence does not accrue until the conviction or sentence has been invalidated."). As a result, some of our sister circuits have concluded that *Heck* is an affirmative defense and not a jurisdictional rule. *See, e.g., Carr v. O'Leary*, 167 F.3d 1124, 1126 (7th Cir. 1999) ("The failure to plead the *Heck* defense in a timely fashion was a waiver[.]"); *Washington v. Los Angeles Cty. Sheriff's Dep't*, 833 F.3d 1048, 1056 (9th Cir. 2016) ("[C]ompliance with *Heck* most closely resembles the mandatory administrative exhaustion of PLRA claims, which constitutes an affirmative defense and not a pleading requirement."). We have not definitively answered that question. *See Dixon v. Hodges*, 887 F.3d 1235, 1237–40 (11th Cir. 2018) (describing *Heck* in dicta as "strip[ping] a district court of jurisdiction," but reversing the district court's dismissal based on *Heck* without directly addressing whether *Heck* is jurisdictional); *Topa v. Melendez*, 739 F. App'x 516, 518 & n.1

17

(11th Cir. 2018) (noting that "other circuits have treated *Heck* as an affirmative defense subject to waiver").

Second, there is an open question as to whether *Heck* applies to situations where, as here, a § 1983 plaintiff may no longer seek habeas relief because she is no longer in custody. *See Muhammad v. Close*, 540 U.S. 749, 752 n.2 (2004) ("Members of the Court have expressed the view that unavailability of habeas for other reasons may also dispense with the *Heck* requirement. . . .  This case is no occasion to settle the issue.").  It is unclear whether *Heck* would apply here, as the length of imprisonment was so short "that a petition for habeas relief could not have been filed and granted while [Ms. Teagan] was unlawfully in custody."  *Morrow v. Fed. Bureau of Prisons*, 610 F.3d 1271, 1272 (11th Cir. 2010).  *See also id*. at 1273 (Anderson, J., concurring) ("[S]everal circuits have recognized an exception from the *Heck* favorable termination requirement for plaintiffs no longer in custody that were precluded from obtaining habeas relief.").

## III

That leaves Ms. Teagan's false imprisonment claim under Georgia Code § 51-7-20.  We conclude that the district court erred in not separately addressing that claim, and remand for further proceedings.  *See, e.g., Stillman v. Travelers Ins. Co.*, 88 F.3d 911, 914 (11th Cir. 1996) (district court erred in granting final, rather than partial, summary judgment where other issues and defenses should have survived

18

and the summary judgment order "did not even purport to adjudicate [a party's] other affirmative defenses").

After ruling that the City could not be liable under § 1983 for the actions of Chief Judge Patten or the McDonough municipal court, the district court stated in a footnote that it did not need to address the parties' other arguments. *See* D.E. 96 at 9 n.2. Insofar as the district court meant to say that it did not need to consider the City's other arguments for rejecting Ms. Teagan's § 1983 claims, it was correct. But if the district court believed that its *Monell* municipal liability ruling necessarily disposed of Ms. Teagan's state-law false imprisonment claim, it was mistaken. The Georgia tort of false imprisonment does not require the sort of municipal liability analysis mandated under § 1983.

False imprisonment in Georgia requires a showing of "the unlawful detention of the person of another, for any length of time, whereby such person is deprived of his personal liberty." Ga. Code Ann. § 51-7-20. The "only essential elements [of false imprisonment] are the arrest or detention and the unlawfulness thereof." *Miller v. Grand Union Co.*, 552 S.E. 2d 491, 494 (Ga. Ct. App. 2001) (citations omitted).

The City urges us to resolve the false imprisonment claim on the merits and argues that it fails because Ms. Teagan was arrested on a "warrant which was properly issued" by Chief Judge Patten. *See* Appellee's Br. at 29 (citing *Carruth v.*

19

*Roberts*, 375 S.E.2d 499, 501–02 (Ga. Ct. App. 1988)). We decline the City's invitation to address the merits for the following reason.

Ms. Teagan contends that the City, through Chief Judge Patten, committed the tort of false imprisonment when it arrested her on a facially invalid warrant and without a finding that she had willfully failed to pay the fine. *See* Appellant's Br. at 29–30. For example, she asserts that there is no such thing as an offense for "failure to pay a fine" under state law or under the City's ordinances. *See id*. at 29. And if there was no such offense, she continues, there could not be any probable cause for her arrest. *See id*. Because there are some Georgia cases suggesting that the invalidity of a warrant may permit a false imprisonment claim, we think it is best for the district court to consider that claim in the first instance. *See, e.g., Franklin v. Consol. Gov't of Columbus*, 512 S.E.2d 352, 355 (Ga. Ct. App. 1999) (rejecting false imprisonment claim because arrest was based on a warrant and "there [wa]s no evidence of invalid process"); *Ridgeview Inst., Inc. v. Handley*, 481 S.E.2d 531, 533 (Ga. Ct. App. 1997) ("An action for false imprisonment will lie where a person is unlawfully detained under a void process, or under no process at all, and can not be maintained where the process is valid[.]") (citation and internal quotation marks omitted); *Stephens v. Big Apple Supermkts. of Rome, Inc.*, 204 S.E.2d 805, 806 (Ga. Ct. App. 1974) ("As the district attorney's affidavit demonstrates that the arrests complained of were founded upon warrants, and as there is no allegation that the

20

warrants are not valid, there was no error in granting defendants' motion for summary judgment on the false imprisonment averments.").

## IV

We are deeply troubled by what happened to Ms. Teagan in the McDonough municipal court.  She, like all other citizens of that City, deserved better.  But given Georgia law and the rationale of our decision in *Familias Unidas*, Chief Judge Patten was acting on behalf of the state, and not on behalf of the City, when he took the actions complained of in the course of adjudicating Ms. Teagan's state-law misdemeanor offense.  We therefore affirm the district court's grant of summary judgment to the City on Ms. Teagan's § 1983 claims.

With respect to Ms. Teagan's state-law false imprisonment claim, the district court erred by not separately addressing it.  As a result, we reverse the grant of summary judgment on that claim and remand for further proceedings.

**AFFIRMED IN PART, REVERSED IN PART, AND REMANDED.**

21

JORDAN, Circuit Judge, concurring:

I join the court's opinion.  The City of McDonough cannot be held liable under 42 U.S.C. § 1983 because the municipal court was not acting on its behalf when adjudicating Ms. Teagan's state-law misdemeanor for failing to maintain automobile liability insurance.

I write separately, however, to express my concern that the McDonough municipal court acted unconstitutionally by jailing Ms. Teagan for failing to pay a fine without determining whether her failure to pay was willful.  This practice, which does not appear to be isolated throughout municipal courts in Georgia, flouts the venerable and long-standing principle that debtors' prisons are unconstitutional.

* * * * * * *

"There can be no equal justice where the kind of trial a man gets depends on the amount of money he has."  *Griffin v. Illinois*, 351 U.S. 12, 19 (1956).  Based on this understanding, the Supreme Court held in *Bearden v. Georgia*, 461 U.S. 660, 672–73 (1983), that revoking an indigent defendant's probation for failure to pay a fine, without inquiring into the reasons for the failure to pay, violates the "fundamental fairness required by the Fourteenth Amendment."  The Court explained that if "the probationer has willfully refused to pay the fine . . . when he has the means to pay," or "fail[ed] to make sufficient bona fide efforts to seek employment or borrow money in order to pay the fine," then imprisonment may be

22

justified.  *See id*. at 668.  "But if the probationer has made all reasonable efforts to pay the fine or restitution, and yet cannot do so through no fault of his own, it is fundamentally unfair to revoke probation automatically without considering whether adequate alternative methods of punishing a defendant are available."  *Id*. at 668–69.  "Only if alternate measures are not adequate to meet the State's interests in punishment and deterrence may the court imprison a probationer who has made sufficient bona fide efforts to pay."  *Id*. at 672.

*Bearden* was based on two earlier Supreme Court cases, *Williams v. Illinois*, 399 U.S. 235 (1970), and *Tate v. Short*, 401 U.S. 395 (1971)—both of which prohibit jailing a criminal defendant "solely because of his indigency."  *Tate*, 401 U.S. at 398.  *See also Williams*, 399 U.S. at 242.  In *Williams*, the Court held that a defendant could not be imprisoned for longer than the statutory maximum for his offense based on his inability to pay a fine or court costs.  *See* 399 U.S. at 239–41.  In *Tate*, the defendant was initially fined for traffic offenses, but when he was unable to pay the fines, he was committed to a municipal prison.  *See* 401 U.S. at 396–97.  The Court held that "the Constitution prohibits the State from imposing a fine as a sentence and then automatically converting it into a jail term solely because the defendant is indigent and cannot forthwith pay the fine in full."  *Id*. at 398.

Many decades ago, the former Fifth Circuit likewise "accept[ed] the principle that imprisonment solely because of indigent status is invidious discrimination and

not constitutionally permissible." *Pugh v. Rainwater*, 572 F.2d 1053, 1056 (5th Cir. 1978) (en banc). It has also held that imposing an alternative sentence "requiring an indigent defendant to pay a fine forthwith or serve a specified number of days in jail" is unconstitutional. *See Frazier v. Jordan*, 457 F.2d 726, 726–730 (5th Cir. 1972). We, of course, are bound by *Bearden*, *Frazier* and *Rainwater*. *See, e.g., Walker v. City of Calhoun*, 901 F.3d 1245, 1259 (11th Cir. 2018) (applying *Bearden* and *Rainwater*).

Georgia courts have also repeatedly applied *Bearden*. *See, e.g., Massey v. Meadows*, 321 S.E.2d 703, 704 (Ga. 1984) ("[A] defendant's probation may not be revoked or withheld because of his failure to pay the fine without a showing of willfulness on his part or inadequacy of alternative punishments."); *Gaither v. Inman*, 322 S.E.2d 242, 243 (Ga. 1984) (applying *Bearden* and *Massey* to a conditionally suspended sentence); *Johnson v. State*, 707 S.E.2d 373, 375 (Ga. Ct. App. 2011) (holding that the defendant's probation could not be revoked for failing to pay court-ordered fines and fees without the trial court first making a finding as to willfulness, even though the defendant entered a negotiated plea, because the court unilaterally imposed the fines). In addition, Georgia's own constitution bans debtors' prisons. *See* Ga. Const. art. 1, § 1, para. XXIII ("There shall be no imprisonment for debt."). *See also Messenger v. State*, 72 S.E.2d 460, 461 (Ga. 1952) (explaining that the Georgia Constitution "commands the three departments

24

of the government . . . to refrain from imprisoning a single person for debt."). And long-standing Georgia precedent makes clear that municipal courts cannot use imprisonment to coerce the payment of a fine. *See Brieswick v. City of Brunswick*, 51 Ga. 639, 642–43 (1874) (holding that a municipal court did not have the power or authority to "coerce the payment of the fine imposed by imprisonment"). What happened to Ms. Teagan is therefore impossible to defend and difficult to understand.

\* \* \* \* \* \* \*

As set forth in the court's opinion, Chief Judge Donald Patten of the McDonough municipal court found Ms. Teagan guilty of driving without insurance and imposed a $745 fine, as well as a $50 penalty for being late to court. Ms. Teagan informed Chief Judge Patten that she was unable to pay the fine that day, but that she would be able to do so by the following Friday, March 28, 2014. After learning that Ms. Teagan could not pay her fine that day, Chief Judge Patten sentenced her to 60 days in jail, suspended on the condition that she pay the $795 fine by March 28.

This is exactly what the Supreme Court prohibited in *Tate*: "imposing a fine as a sentence and then automatically converting it into a jail term solely because the defendant is indigent and cannot forthwith pay the fine in full." 401 U.S. at 398. As the Supreme Court explained, "[i]mprisonment in such a case is not imposed to further any penal objective of the State. It is imposed to augment the state's revenues

25

but obviously does not serve that purpose; the defendant cannot pay because he is indigent and his imprisonment, rather than aiding collection of the revenue, saddles the State with the cost of feeding and housing him for the period of his imprisonment." *Id*. at 399. It also contravenes Georgia's own precedent that a municipal court cannot coerce a fine by imprisonment. *See Brieswick*, 51 Ga. at 642–43.

Here, as in *Tate*, sentencing Ms. Teagan to jail—when Chief Judge Patten initially was only going to impose a fine—served no legitimate penological purpose. *See* 401 U.S. at 399. As suggested in *Tate*, it seems more likely that the suspended jail term was imposed to coerce payment and raise City revenues, as the City profits from the collection of fines. Ms. Teagan was convicted of failing to maintain automobile liability insurance in violation of Georgia Code § 40-6-10. But under Georgia law, when a municipal court tries offenses under § 40-6-10, "[a]ny fines . . . arising from the prosecution of such cases shall be retained by the municipality and shall be paid into the treasury of such municipality." Ga. Code Ann. § 36-32-7(b). Indeed, Ms. Teagan presented evidence demonstrating that since 2012, the McDonough municipal court has generated over $7.4 million in revenue for the City from the payment of fines, averaging over 10 percent of the City's general-fund revenues for that time period. Given Ms. Teagan's experience, one wonders how much of that sum was secured through unconstitutional means.

26

After Ms. Teagan did not pay the fine, she was arrested and jailed on May 18, 2014, without any hearing to determine whether her failure to pay was willful. Even at her subsequent appearance ten days later, Chief Judge Patten made no attempt to determine whether Ms. Teagan had the ability to pay the fine. These actions by Chief Judge Patten directly contravened the Supreme Court's holding in *Bearden* that imprisoning a defendant for failure to pay a fine, without inquiring into the reasons for the failure to pay or considering alternative measures, violates the "fundamental fairness required by the Fourteenth Amendment." 461 U.S. at 672–73.

Had there been a hearing, Ms. Teagan could have shown that she did not willfully fail to pay the fine. In her unrebutted deposition testimony, Ms. Teagan explained that she lost her job in February of 2014, but that at the time of the bench trial on March 19, 2014, she thought that she would be able to secure a loan to pay the fine. When she went to obtain the loan, however, she found out that she could not secure the loan without proof of employment.

That Ms. Teagan did not willfully fail to pay is further evidenced by the fact that she filed a *pro se* "Motion for a Stay Pending Appeal" on March 24, days before the March 28 deadline. Although Chief Judge Patten determined that the motion was not in the proper form, he did not issue an order denying the motion. And no one at the municipal court notified Ms. Teagan that her motion, though filed, had

27

effectively been denied.  Thus, when her fine came due on March 28, Ms. Teagan reasonably believed that her sentence (including the payment of the fine) had been stayed pending appellate review.

Adding further insult to injury, not only was Ms. Teagan jailed without a hearing, but Chief Judge Patton added an additional $100 "contempt charge" to her fine.  I know of no Georgia law authorizing a municipal court to impose additional fees against an indigent defendant as punishment for his or her failure to pay a fine. A Georgia statute gives municipal courts the power and authority "[t]o impose fines upon persons convicted of . . . offenses, with the alternative of *other* punishment allowed by law," e.g., ordering community service, "in the event such fines are not paid." *See* Ga. Code Ann. § 36-32-5 (emphasis added).  In other words, if a person is unable to pay a fine, the municipal court may impose "other," or different, punishment—not an additional fine. *See* American Heritage College Dictionary 967 (3d ed. 1993) (defining "other" as "[d]ifferent from that or those implied or specified").

\* \* \* \* \* \* \*

Ms. Teagan's ordeal seems to exemplify a broader problem.  The City of McDonough is not the only municipality in Georgia that raises a significant portion of its revenue from collecting fines—or that collects these fines through its municipal court's vigorous enforcement of traffic violations. *See, e.g.,* Dick M.

28

Carpenter II, Ph.D., Kyle Sweetland, & Jennifer McDonald, Inst. for Justice, *The Price of Taxation by Citation: Case Studies of Three Georgia Cities that Rely Heavily on Fines and Fees* 4–5 (2019) (examining three Georgia cities which generate on average 14–25% of their revenues from fines and fees, and which use municipal courts as "highly efficient revenue collectors").

Nor is Georgia the only state where local governments collect a significant portion of their revenues from fines. *See* U.S. Comm'n on Civil Rights, *Targeted Fines and Fees Against Communities of Color: Civil Rights and Constitutional Implications* 21–22 (2017) (discussing municipalities throughout the country that receive 10% or more of their revenue from fines and fees). Some commentators have noted that municipal courts' aggressive enforcement of the payment of fines—including unconstitutionally imprisoning defendants for their debt—has been on the rise since the 2008 recession, when local governments became increasingly strapped for funds. *See, e.g.,* Christopher D. Hampson, *The New American Debtors' Prison*, 44 Am. J. Crim. L. 1, 8 (2017) (noting that the problem of imprisonment for debt "has become exacerbated since the Great Recession, when many municipalities were driven by financial need to look for alternative sources of money"); Roopal Patel & Meghna Philip, Brennan Ctr. for Justice, *Criminal Justice Debt: A Toolkit for Action* 2 (2012) ("As states have become increasingly strapped for funds, some have looked to a most unlikely revenue source: the disproportionately poor people involved in

29

the criminal justice system. . . . [I]ncreasing numbers of states are creating new pathways to imprisonment based solely on criminal justice debt.").

Not surprisingly, multiple lawsuits have been filed in our Circuit challenging these types of practices on various grounds, and in at least some cases, district courts have denied motions to dismiss. *See, e.g., Chapman v. City of Clanton*, No. 2:15-cv-125, 2017 WL 1508182, at \*2–5 (M.D. Ala. Apr. 25, 2017) (denying in part motion to dismiss claims that the city violated the plaintiffs' constitutional rights by jailing them for their inability to pay fines without inquiring as to their indigency); *Brucker v. City of Doraville*, 391 F. Supp. 3d 1207, 1215–17 (N.D. Ga. July 9, 2019) (denying motion to dismiss the plaintiffs' due process claim, which asserted that the city's reliance on fines, fees, and forfeitures created a conflict of interest for municipal court judges, who are financially incentivized to convict defendants appearing before them); *Ray v. Judicial Corr. Servs.*, No. 2:12-CV-02819, 2013 WL 5428360, at \*15 (N.D. Ala. Sept. 26, 2013) (denying in part the city's motion to dismiss constitutional claims challenging fine collection practices that resulted in the plaintiffs being jailed without an indigency determination). Some courts in other parts of the country have likewise allowed these types of claims to proceed past the dismissal or summary judgment stages, or even granted summary judgment in favor of the plaintiffs. *See, e.g., Alkire v. Irving*, 330 F.3d 802, 816–19 (6th Cir. 2003) (reversing the district court's grant of summary judgment in favor of the defendants

30

on the plaintiff's claims that his Thirteenth and Fourteenth Amendment rights were violated when he was imprisoned for failing to pay court costs and fees without any inquiry into his ability to pay); *Fant v. City of Ferguson*, 107 F. Supp. 3d 1016, 1030–32 (E.D. Mo. 2015) (holding that the plaintiffs pleaded sufficient facts to state a plausible claim that the city's policy and practice of jailing them for their inability to pay fines violated the Due Process and Equal Protection Clauses); *Doe v. Angelina Cty.*, 733 F. Supp. 245, 255–57 (E.D. Tex. 1990) (granting the plaintiff's motion for partial summary judgment on his § 1983 due process claim against the county, which asserted that he was unlawfully imprisoned for failing to pay a fine as a result of a county's policy); *Kneisser v. McInerney*, No. 1:15-cv-07043-NLH-AMD, 2018 WL 1586033, at \*13–14 (D.N.J. Mar. 30, 2018) (granting the plaintiff's motion for partial summary judgment against the city on his claims that his constitutional rights were violated by the municipal court when he was sent to jail because he was unable to pay a fine imposed for a littering offense).

But what happened to Ms. Teagan should not be a common occurrence. "Courts are supposed to dispense justice, not be looked upon as cash registers for the government." ACLU, *In For a Penny: The Rise of America's New Debtors' Prisons* 55 (2010) (citation and internal quotation marks omitted). Jailing a defendant for failing to pay a fine—without any determination that her failure to pay was willful—is a flagrant violation the U.S. Constitution. *See Bearden*, 461 U.S. at

31

668–69. A municipal court cannot shirk its duties to protect indigent defendants'

constitutional rights in order to line its city's coffers.

TJOFLAT, Circuit Judge, specially concurring:

I concur in the judgment of the Court. I write separately to state that I believe Teagan's 42 U.S.C. § 1983 claims are barred under *Heck v. Humphrey*, 512 U.S. 477, 114 S. Ct. 2364 (1994), which requires Teagan to prove that her "conviction or sentence has been reversed on direct appeal, expunged by executive order, declared invalid by a state tribunal authorized to make such determination, or called into question by a federal court's issuance of a writ of habeas corpus" before her claims are cognizable under § 1983. *Id.* at 487, 114 S. Ct. at 2372. Because Teagan has not offered such proof, the City is entitled to summary judgment on her § 1983 claims regardless of whether the actions of the municipal court could be attributed to the City under *Monell*.